LARRY ALGUIRE, Plaintiff-Appellee, v. JOHN W. WALKER *et al.*, Defendants-Appellants.

First District (3rd Division) No. 84—0881

Opinion filed March 18, 1987.

Richard T. Wimmer and Edward A. McCarthy, both of Chicago, for appellants.

Steven B. Varick and Evan M. Kjellenberg, both of Chicago (Terence J. Tyksinski, of counsel), for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Larry Alguire, brought this action for specific performance and other relief against defendants John W. Walker and Walker Equipment and Supply Company. Following a bench trial, the trial court entered judgment in favor of Alguire in the amount of $471,497, including prejudgment interest. The court also awarded Alguire $15,000 in punitive damages. On appeal defendants contend that the trial court's judgment in favor of Alguire was against the manifest weight of the evidence, as were the awards of $471,497 in damages and $15,000 in punitive damages. We affirm in part, modify in part, and reverse in part.

Walker is the president and sole shareholder of Walker Equipment and Supply Company, which sells, rents, and repairs construction equipment. Sometime between November 1980 and early January 1981, Walker agreed to demolish five block barn buildings on Washington Park Race Track for Providence Capital Realty Group.

In early January 1981, Alguire contacted Walker because he was interested in buying land which Walker owned. Alguire wanted the property so that he could erect a building in which to store the equip-

ment that he used in his tree trimming and removal service. At their first meeting, Walker indicated that the land he owned was divided into 10 lots that were approximately one acre in size. Alguire testified that Walker stated a price of $10,000 per acre. Walker testified that he asked for $15,000 per acre. The parties went to view the land, and Alguire indicated that he would be interested in the two back lots, although he was seeking a better price. According to Alguire, Walker indicated the two lots with his arm.

Either at the first or second meeting between Alguire and Walker, Walker mentioned to Alguire the five buildings that he had agreed to dismantle and salvage. Walker told Alguire that if he was interested in the project, they could work something out. After Alguire inspected the buildings, he and Walker met to discuss the terms pursuant to which Alguire would undertake the project. An oral agreement was reached, of which most of the terms are undisputed. Specifically, the parties agreed that (1) Alguire would provide the labor, including his own time, to dismantle the five buildings; (2) Walker Equipment and Supply Company would provide the equipment necessary for the job; (3) the parties would split the net proceeds from the sale of the salvaged building parts, after all the costs relating to the project had been paid; and (4) Alguire and Walker would each receive one of the two structural steel buildings which were being dismantled. The parties disagreed as to whether Walker's property was part of the deal. Alguire testified that he was to receive the two acres of property which he had discussed with Walker when they first met. Walker denied in his testimony that the property was part of the agreement. The parties also disputed whether a time limit had been made a condition of the agreement. According to Walker, he informed Alguire that Providence Capital Realty Group wanted the job done in 90 days. Alguire denied that any time limit was set.

Alguire began the demolition work on January 17, 1981. Towards the end of January, Alguire and Walker went to see Walker's accountant, Jeffrey Wadley, to discuss a written agreement. Wadley advised the men to get liability insurance and to have an attorney draw up a joint venture or partnership agreement. Alguire testified that when he mentioned the two acres of land, Wadley said that there was a problem because Walker was buying the land on an installment contract. Wadley, when he testified, did not recall any conversation regarding property, and Walker denied that property was discussed with Wadley. Subsequently, Alguire and Walker met with Walker's attorney, who prepared a joint venture agreement. According to Alguire, after looking over the agreement, he complained to Walker that the agreement

did not mention the property, and Walker responded that there was a problem with the land but that he would take care of it. Walker denied that this exchange took place.

Thereafter, Walker spoke to his insurance agent regarding insurance for the project. Walker learned that his current liability insurance would not extend to the project if the project were in the form of a joint venture or partnership. The additional premium to bring the project within coverage would have been $10,000. The parties agreed that they did not wish to incur this additional expense.

On May 27, 1981, Alguire and Walker had a meeting. Alguire testified that Walker asked him how much longer the project would take, and he responded that there were only two or three days of work left. Alguire stated that he complained to Walker that the project was almost completed, yet they still did not have a written agreement. Alguire informed Walker that until there was a written agreement, "[he had] a mind of keeping the material." The following day, May 28, Walker came by the site and gave Alguire a letter terminating him from the project. When Alguire demanded a reason for the termination, he was told that the job was not being completed quickly enough. Alguire stated that there had been no prior complaints about his work pace. Walker testified that beginning in April, he had repeatedly expressed concern to Alguire regarding the slow progress of the work. Walker testified that Terry Zona, Providence Capital Realty Group's agent who had alerted Walker to the demolition project and who worked at Washington Park, had previously stated his dissatisfaction with the progress of the demolition. Walker further testified that in May, Zona threatened to bulldoze the two steel structures which were still standing if they were not immediately dismantled. In his testimony, Zona admitted making these statements to Walker. According to Walker, it took 11 days to complete the demolition and salvage work after Alguire was removed from the project.

■ The first issue we address is whether the trial court erred in finding that there was an enforceable agreement regarding the two acres of land. Alguire initially sought specific performance of the conveyance. Rather than granting Alguire specific performance, the trial court awarded him $20,000 as damages. According to defendants, the evidence was insufficient to remove the oral agreement to convey from the Statute of Frauds, and the trial court erred in compensating Alguire for this portion of the alleged agreement.

Generally, an oral contract to transfer real estate is unenforceable under the Statute of Frauds (Ill. Rev. Stat. 1979, ch. 59, par. 2). Such contracts may be specifically enforced in equity, however, if the court

finds that the terms of the contract are clear, definite, and unequivocal, that the contract has been at least partially performed by the party seeking to have the contract enforced, and that the acts allegedly done in performance are positively attributable exclusively to the contract. (*Intini v. Marino* (1983), 112 Ill. App. 3d 252, 256, 445 N.E.2d 460, 464.) Moreover, it must appear that the promisee cannot be made whole by damages or by other adequate remedy at law. (See *Wessel v. Eilenberger* (1954), 2 Ill. 2d 522, 527, 119 N.E.2d 207, 210.) The burden is upon the party seeking the application of equitable principles to defeat the interposition of the Statute of Frauds not only to establish the terms and conditions of the parol agreement but also to show that enforcement of the parol agreement is required to prevent fraud or injustice. *Conness v. Conness* (1968), 94 Ill. App. 2d 281, 284, 236 N.E.2d 753, 755.

In the present case, Alguire's testimony regarding the two acres of land was totally contradicted by Walker's testimony. According to Alguire, Walker promised to convey him two acres as part of the consideration for his dismantling the buildings at Washington Park. Alguire testified that when he initially contacted Walker because he was interested in purchasing some of Walker's property, Walker told him that he wanted $10,000 per acre. When they went and looked at the property, Walker indicated that he wanted to keep the front five acres and sell the back five acres. Alguire further testified that he told Walker that he would be interested in the back two lots and that Walker stuck out his arm and said, "That's the two acres. That's two acres from here to here (indicating)." Alguire understood that the lot line would be from 32nd Street, going north two acres along Millers Woods.

Alguire also testified that when he informed Walker that the land was too expensive, Walker mentioned the demolition project and stated that maybe they could work something out. Subsequently, Alguire stated, the conveyance of the property was made a part of their oral agreement. According to Alguire, the conveyance was discussed with Walker's accountant, Wadley. Alguire also stated that he complained to Walker about the absence of a provision relating to the land in the written agreement prepared by Walker's attorney. Finally, Alguire testified that Walker continually assured him that he was attempting to secure a written agreement which, according to Alguire, would have included a provision for the property.

Walker, in contrast, denied that a conveyance of two acres of his property was part of his agreement with Alguire. Rather, he testified, Alguire hoped to make enough money from the demolition and salvaging operation to enable him to purchase the property, which Walker

had told him would cost $15,000 per acre. Walker further testified that Alguire never complained that the agreement drawn up by his attorney did not refer to the conveyance of land. While Walker admitted that he periodically discussed a written agreement with Alguire, he denied that he represented to Alguire that he was continuing his efforts to procure a written agreement.

■ Even though the trial court found Alguire to be more credible than Walker, it did not award Alguire specific performance in regard to the two acres of land, but instead awarded him compensation in the amount of $20,000. We believe, however, that neither specific performance nor damages should have been granted. First, Alguire failed to prove that the Statute of Frauds should not be applied here. Alguire's testimony was not so clear, definite, and unequivocal as to establish that Walker intended to convey, rather than sell, the land to Alguire. Nor did Alguire's testimony show that his efforts in dismantling the Washington Park buildings were positively attributable exclusively to an agreement which included the conveyance of the land, since Alguire was to be otherwise compensated by half of the proceeds from the salvage sales and his receipt of one of the steel structure buildings. Also, the demolition itself was wholly unrelated to Walker's property. Furthermore, we do not believe that Alguire established that he could not be made whole by damages or other legal remedy. Accordingly, specific performance would not have been an appropriate remedy here.

■ Moreover, we believe that Alguire should not have been entitled to damages, because even if an agreement to convey were shown to exist by clear and convincing evidence, it would be unenforceable due to lack of specificity. As defendants point out, Alguire's description of the property was uncertain and at times contradictory. Although Alguire identified two of the property boundaries by street names and noted that the property ran parallel to one of the streets, the evidence showed that Walker had other lots which also ran parallel to that street. Alguire was also impeached by the fact that he had given a different name for one of the streets at his deposition. Furthermore, Alguire's own testimony was that Walker only "pointed out" the two acres and that there were no markers indicating within Walker's tract where the boundary line would be drawn. Finally, a witness called by Alguire, to whom Alguire had allegedly pointed out the property, incorrectly identified the property on a map. Therefore, even apart from the Statute of Frauds problems, we conclude that any agreement to convey property was unenforceable due to lack of specificity. Thus, the trial court erred in awarding Alguire $20,000 as damages for Walker's failure to convey the property.

▪ Next, defendants argue that the trial court erred in finding that no completion date was set for the dismantling project because the evidence showed that Alguire agreed to complete the project within 90 days. At the very least, defendants argue, Alguire should have completed the work within a "reasonable time" in view of the numerous demands which Walker testified that he made upon Alguire to finish the job. These arguments must be rejected.

According to Walker, the 90-day limit was part of his agreement with Providence Capital Realty Group. However, the only written document relating to the agreement between Providence Capital Realty Group and Walker is the authorization letter that Walker received in which he was given permission to enter Washington Park Race Track for the purpose of demolishing the five buildings. This letter did not mention any time limitation period. Moreover, while Walker testified that he was to begin working upon receipt of the letter, the letter is undated. In fact, Walker testified that he thought he received the letter around January 1, 1981, yet Alguire did not agree to undertake the demolition project until mid-January.

Walker argues that his testimony regarding the time period is supported by the testimony of Terry Zona and that of Alguire, himself. However, although Zona testified that he told Walker that the job must be completed within 90 days, he was impeached by his deposition testimony where he indicated that Walker would have four months. More importantly, Zona testified that he never informed Alguire about the time restraint. Also, we do not believe that the testimony of Alguire upon which Walker relies, which was to the effect that Alguire hoped to complete the work in April so that he could then devote full time to his tree service business, signifies that Alguire knew about the 90-day limit. Alguire testified that he was never apprised of the 90-day limit and would not have taken the job subject to that condition due to uncertainties in regard to the winter weather. The trial court found Alguire's testimony to be more credible than that of Walker, and the record supports this determination. We therefore reject defendants' argument that the trial court erred in not finding that the completion of the demolition and salvage work within 90 days was part of the parties' agreement.

▪ In addition, we reject defendants' argument that Alguire failed to perform the demolition work within a reasonable period of time. The record shows that Alguire worked steadily, with the exception of days when the weather prohibited work, and that he worked meticulously to salvage as much of the materials as possible. Moreover, Alguire testified that Walker never complained to him about the pro-

gress of the work, and Walker testified that he had no complaints about the progress until April. The evidence also shows that Walker and Zona never criticized Alguire for the manner in which he accomplished the demolition, nor did they suggest alternative methods of handling the project. Absent specific complaints about Alguire's performance, the mere fact that Walker might have made demands on Alguire to finish the job more quickly does not establish that Walker's demands were themselves reasonable. Accordingly, we believe that the evidence clearly shows that Alguire performed the dismantling and salvage work within a reasonable period of time.

We next address defendants' contention that Alguire anticipatorily breached the agreement, thereby rendering it unenforceable. The sole basis for defendants' contention is Alguire's threat to Walker on May 27 that he was of "a mind" to keep the salvage materials until Walker provided a written agreement. The following day, May 28, Walker gave Alguire the letter removing him from the project. When Alguire asked the reason for his termination, Walker replied that the work was not being completed quickly enough.

For a party to be justified in treating a renunciation as an anticipatory breach of contract, there must be a definite and unequivocal manifestation that a promised performance will not be forthcoming. However, doubtful and indefinite statements that the performance may or may not take place are not, in and of themselves, enough to constitute repudiation. (*Henderson v. Lemna* (1979), 76 Ill. App. 3d 168, 170, 394 N.E.2d 1070, 1072, quoting *Stonecipher v. Pillatsch* (1975), 30 Ill. App. 3d 140, 142-43, 332 N.E.2d 151, 153-54.) Here, Alguire's alleged renunciation was far too indefinite to constitute an anticipatory breach. At most, Alguire's statement indicated that he was *contemplating* taking some action in view of what he considered to be Walker's failure to provide a written agreement. Alguire did not cease to work on the project following his threat, nor is there any evidence that Alguire actually harbored any of the salvaged materials from Walker. Therefore, defendants' argument that Alguire anticipatorily breached the agreement is rejected.

Defendants next question the trial court's award of damages. Initially, defendants attack the trial court's award of $390,000 to Alguire as the reasonable value of the structural steel building to which Alguire was entitled. This amount was based on the trial court's finding that the reasonable value of the building was $450,000, but that it would cost Alguire $60,000 to transport and erect the building. Defendants argue that these figures, which were testified to by Alguire, are wholly unsupported by the record because Alguire's testi-

mony was based on hearsay. Alguire testified that he talked to different contractors who told him that it would cost $450,000 for a new building, and $60,000 to re-erect the Washington Park structure. The trial court allowed Alguire to testify to these figures over defendants' hearsay objection. We agree with defendants that their objection should have been sustained. Since Alguire's testimony was not based on his own personal knowledge, but was predicated on the statements of others, it was hearsay and should have been excluded. (See *Looby v. Buck* (1959), 20 Ill. App. 2d 156, 161, 155 N.E.2d 641, 644.) Alguire's contention, that because he had dismantled the building "no one could be better qualified" to determine the building's value, is untenable.

■■ Next, defendants argue that the trial court's valuation of the two acres of land which Walker was allegedly to convey to Alguire was erroneous because there was insufficient evidence to show that the land was worth $20,000. In view of our prior determination that any promise to convey land was unenforceable, the $20,000 award was improper.

Defendants also dispute certain additional findings that the trial court made in regard to damages. In deciding the damages to be awarded, the court found that the component parts of the structural steel building were worth $45,000; that Alguire's share of the salvaged materials for which defendant had not accounted was $59,080; and that labor costs which Alguire was entitled to recover were $8,448. Defendants argue that there is insufficient evidence to support these figures, since there was conflicting testimony regarding each of these items. We believe, however, that the accuracy of these figures raised questions of credibility which the trial court resolved in favor of Alguire. We conclude that these amounts, which total $112,528, reflect the damages to which Alguire is entitled.

■■ Defendants further argue that the trial court should not have awarded Alguire prejudgment interest. We agree that the award was improper.

Generally, there is no right to recover prejudgment interest unless it is permitted by statute or there is an agreement between the parties. (*Obermaier v. Obermaier* (1984), 128 Ill. App. 3d 602, 610, 470 N.E.2d 1047, 1054.) Alguire argues that the award of prejudgment interest was allowable here pursuant to Section 2 of "An Act in relation to the rate of interest ***" (Ill. Rev. Stat. 1983, ch. 17, par. 6402), which permits prejudgment interest to be given, *inter alia,* where there is a liquidated account. According to Alguire, the amount of damages involved here was liquidated because "[e]ach of the amounts was precisely measurable." This contention lacks merit.

For prejudgment interest to be awarded, the damages must be liquidated or subject to exact computation. (See *Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 809, 405 N.E.2d 1051, 1064-65.) Here, Alguire's damages were hotly disputed. In fact, due to the uncertainty of his damages, Alguire submitted alternative measures of damages to the trial court for its consideration. Moreover, our determination that some of the compensatory damages awarded were improper defeats Alguire's claim that the damages were liquidated because they were precisely measurable.

Alguire further argues that a trial court, relying on equitable principles, may award prejudgment interest where justice requires. We do not find here the unique factual circumstances which will justify an award of prejudgment interest. (See *Richman v. Chicago Bears Football Club, Inc.* (1984), 127 Ill. App. 3d 75, 78, 468 N.E.2d 487, 489-90.) Alguire's only support for his argument is that defendants wrongfully retained money owed to Alguire for more than three years. This three-year period, however, merely represents the period of time during which the litigation of this matter took place, and Alguire does not contend that defendants caused the litigation to be delayed. For all of these reasons, we conclude that Alguire is not entitled to prejudgment interest.

In their final argument relating to damages, defendants contend that punitive damages should not have been awarded here. In support of the award, Alguire argues that the evidence establishes that defendants acted wilfully and maliciously in their conduct towards Alguire.

The purpose of punitive damages is to punish the defendant and to deter others from committing similar acts. Since punitive damages are penal in nature, they are not favored in the law, and courts must exercise caution to see that punitive damages are not improperly or unwisely awarded. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 187-88, 384 N.E.2d 353, 360.) In particular, Illinois does not favor punitive damages for breach of contract (*Graf's Beverage of Illinois, Inc. v. Tauber* (1977), 50 Ill. App. 3d 1047, 1052, 366 N.E.2d 150, 154), although punitive damages will be allowed where the breach amounts to an independent tort and there are proper allegations of malice, wantonness, or oppression (*St. Ann's Home for the Aged v. Daniels* (1981), 95 Ill. App. 3d 576, 580, 420 N.E.2d 478, 481-82). We do not believe that the facts of this case come within the exception. The evidence shows that the parties entered into their agreement in haste and subsequently encountered unexpected difficulties when they attempted to reduce their agreement to writing. The only finding of the trial court

in which it stated that defendants acted in a "wilful and malicious" manner was in regard to the fact that Walker brought an off-duty police officer with him when he terminated Alguire from the project. This action is clearly insufficient to support an award of punitive damages. Moreover, while Walker's termination of Alguire was improper, it was prompted, in part, by Alguire's threat to sequester the salvageable materials. The record simply does not establish that Walker's conduct was the result of malice, wantonness, or oppression. Accordingly, punitive damages should not have been awarded.

█ Finally, Walker argues that the trial court erred in finding that he, individually, was a party to the agreement, separate and independent from Walker Equipment and Supply Company. This argument must be rejected. Alguire testified that he believed that he was dealing with Walker as well as with Walker's company. When he initially contacted Walker, it was in regard to property which was owned by Walker and not Walker Equipment. The subsequent agreement between the parties arose out of this initial contact. Although Walker denied that he was individually involved in the agreement with Alguire, his denial merely raised a question of credibility which the trial court decided in favor of Alguire. Walker contends that his argument is supported by the fact that the authorization letter from Providence Capital Realty Group grants "John Walker of Walker Equipment Co." access to Washington Park. We do not believe, however, that this passing reference to the company establishes that Providence Capital Realty Group was dealing solely with the company and not Walker, since the words "of Walker Equipment Co." may have been used solely for the purpose of establishing Walker's identity. Moreover, as Alguire points out, even if Providence Capital Realty Group's agreement was with Walker Equipment and not with Walker, this fact is not determinative of whether Walker was a party to the agreement with Alguire. We conclude that there was sufficient evidence to support the trial court's decision to hold Walker individually liable.

Accordingly, the trial court's order is affirmed to the extent that it provides for judgment to be entered against both Walker and Walker Equipment and Supply Company. The trial court's order is modified to reflect that damages awarded to Alguire shall be $112,528. The trial court's order is reversed insofar as it provides for prejudgment interest and punitive damages.

Affirmed in part; modified in part; and reversed in part.

McNAMARA, P.J., and WHITE, J., concur.