WARREN OUWENGA *et al.*, d/b/a Ouwenga Vegetable and Grain Farms, Plaintiffs-Appellees, v. NU-WAY AG, INC., Defendant-Appellant.

Third District   No. 3—92—0083

Opinion filed December 3, 1992.

Herbolsheimer, Lannon, Henson, Duncan & Reagan, of La Salle (R.J. Lannon, Jr., of counsel), and Karen C. Eiten, of Herbolsheimer, Lannon, Henson, Duncan & Reagan, of Ottawa, for appellant.

J. Dennis Marek, of Ackman, Marek, Boyd & Simutis, of Kankakee (Robert W. Boyd, of counsel), for appellees.

JUSTICE SLATER delivered the opinion of the court:

Following a bench trial in the circuit court of Kankakee County, plaintiffs Warren, Sharon and Richard Ouwenga, d/b/a Ouwenga Vegetable & Grain Farms, were awarded judgment and damages against defendant Nu-Way Ag, Inc., for breach of an implied warranty arising from the sale of certain agricultural chemicals. On appeal, defendant contends that the trial court erred in: (1) finding that defendant breached an implied warranty of merchantability; (2) awarding damages for a crop loss on 48 acres; (3) awarding damages for lost trucking revenue; (4) awarding damages for "expenses associated with the kill"; and (5) awarding prejudgment interest. We affirm in part and reverse in part.

Plaintiffs own and operate a vegetable and grain farm. Defendant is in the business of providing herbicides and other chemicals to area

farmers. In June of 1988, plaintiffs contacted defendant and requested application of a mixture of nitrogen and Treflan herbicide to certain fields on plaintiffs' farm. On June 30, 1988, employees of defendant prepared three loads of chemicals and spread them over 50 acres of the farm. During the first load, the chemicals were applied to a 22-acre field identified as field 10. Field 10 was planted with cabbage seeds on July 1, 1988. Seven to ten days later, the cabbage plants on that field sprouted and died. Plaintiffs suspected that the problem was caused by heat stress or a condition known as crusting. They consulted with defendant, who assured them that the chemicals had been properly applied as requested.

On July 23, 1988, plaintiffs replanted field 10 with cabbage. When plaintiffs replanted the cabbage, they were forced to plant cucumbers instead of cabbage on another field, field 12, in order to keep to their harvesting schedule. Plaintiffs could not plant both field 10 and field 12 with cabbage at the same time because they did not have the labor and equipment necessary for the simultaneous harvest of both fields. The cabbage planted on field 10 again sprouted and died.

After the second failure of field 10, plaintiffs began to suspect a chemical kill. In early August, plaintiffs had a horticulture expert run soil tests on samples from field 10. The tests revealed that the soil contained metribuzine, a triazine commonly used for weed control on soybean crops. Metribuzine is injurious to cabbage. Plaintiffs have never used a chemical containing metribuzine. At the time defendant applied the chemicals to plaintiffs' field, defendant carried a product containing metribuzine. Dr. John Masiunas, an expert in vegetable herbicides, examined field 10 on August 14. He concluded that the cause of the cabbage kill was an improper application of a chemical, probably a triazine.

Plaintiffs filed a two-count complaint alleging defendant breached an implied warranty of fitness for a particular purpose and an implied warranty of merchantability under the Uniform Commercial Code (Ill. Rev. Stat. 1989, ch. 26, pars. 2—315, 2—314) (the Code). Plaintiffs alleged that the chemical mixture sprayed on field 10 by defendant on June 30 contained metribuzine and that this caused the crop failure. Following a two-day bench trial the court entered judgment in favor of plaintiffs. The court awarded damages in the amount of $137,957.52 for lost cabbage crops on 48 acres, $15,434.44 for lost trucking revenue, and $2,713.85 for expenses associated with the kill. The court also awarded prejudgment interest on all damages except the lost trucking revenue.

We first address defendant's contention that the trial court erred in finding that defendant breached an implied warranty of merchantability. Section 2—314 of the Code provides in relevant part:

"(1) Unless excluded or modified (Section 2—316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. ***

(2) Goods to be merchantable must be at least such as

* * *

(c) are fit for the ordinary purposes for which such goods are used." (Ill. Rev. Stat. 1989, ch. 26, par. 2—314.)

Defendant argues that plaintiffs failed to establish that the chemicals used by defendant were not "fit for the ordinary purposes for which such goods are used." In essence, defendant is claiming that plaintiffs failed to prove that defendant's chemicals killed the cabbage. If the chemicals did kill the cabbage, they were certainly not fit for their ordinary purpose.

■■ Whether an implied warranty has been breached is a question of fact, and the trial court's determination on that issue will not be set aside unless it is against the manifest weight of the evidence. (*Midland Supply Co. v. Ehret Plumbing & Heating Co.* (1982), 108 Ill. App. 3d 1120, 440 N.E.2d 153.) It is well settled that the defective condition of a product can be shown by circumstantial evidence. *Erzrumly v. Dominick's Finer Foods, Inc.* (1977), 50 Ill. App. 3d 359, 365 N.E.2d 684.

■■ We find that the evidence presented by plaintiffs in this case, although completely circumstantial, was sufficient to support the trial court's finding that defendant's chemicals killed the cabbage on field 10. Soil tests on samples from the affected field revealed the presence of metribuzine, a triazine herbicide injurious to cabbage. Dr. Masiunas, a vegetable herbicide expert, examined the field in August of 1988 to determine the cause of the kill. He was able to rule out the possibility of a disease or insect problem, a drifting over of herbicide applied on adjoining fields, or chemicals being washed in from adjoining fields. Dr. Masiunas concluded that the cause of the kill was an improper application of a triazine herbicide such as metribuzine. The only herbicide used by plaintiffs contained no metribuzine. At the time defendant applied chemicals to plaintiffs' field on June 28, 1988, defendant had a product in stock called Preview, which contained metribuzine. Most importantly, defendant applied three loads of chemicals to plaintiffs' field on June 28. Defendant's records showed that the first load covered 22 acres, the same 22 acres killed. Based on

these facts, the trial court could reasonably conclude that defendant applied metribuzine to the field on June 28, thereby breaching an implied warranty to provide merchantable goods, to wit, chemicals suitable for use on cabbage.

Defendant contends that the trial court ignored the testimony of defendant's employees who stated that Preview could not be mistaken for Treflan, and that on June 28, 1988, only Treflan and nitrogen were applied to plaintiffs' field. The trial court was in the best position to weigh the evidence and judge the credibility of the witnesses, and we will not disturb its findings on these issues. *DeLong v. Cabinet Wholesalers, Inc.* (1990), 196 Ill. App. 3d 974, 554 N.E.2d 574.

■ Defendant also contends that it did not breach an implied warranty of fitness for a particular purpose. Our review of the record indicates that the trial court found a breach of an implied warranty of merchantability. Because we have affirmed that finding, we need not decide whether defendant also breached an implied warranty of fitness for a particular purpose.

Defendant next raises a number of issues concerning the amount of damages awarded to plaintiffs. Defendant first contends that the trial court erred in awarding damages for lost crop profits on 48 acres. Defendant acknowledges that lost profits are a proper element of damages for breach of warranty (*Burrus v. Itek Corp.* (1977), 46 Ill. App. 3d 350, 360 N.E.2d 1168), and defendant raises no argument concerning the method and figures used by plaintiffs and the trial court to calculate the loss of profits per acre. However, defendant contends that the court erred in awarding damages for lost profits on the 26 acres identified as field 12 along with the affected 22 acres of field 10. Defendant argues that plaintiffs' decision to replant field 10 with cabbage, and plant cucumbers instead of cabbage on field 12, was unreasonable and constituted a failure to mitigate damages. We disagree.

Ron Ouwenga testified concerning plaintiffs' planting and harvesting schedule. Plaintiffs' labor, equipment, and processing facilities allow them to harvest, process and transport 20 to 30 acres of cabbage in approximately two weeks. Plaintiffs plant fields every 10 to 14 days so that they will have a continuous harvest but will not be overburdened at any one time. By July 23, 1988, it was clear to plaintiffs that something was wrong with the cabbage on field 10. At that point, plaintiffs were preparing to plant field 12. Plaintiffs wanted to avoid replanting field 10 at the same time that they planted field 12 because they would not be able to harvest both fields simultaneously. Plaintiffs therefore decided to plant cucumbers on field 12 and replant

field 10 with cabbage. Cucumbers have a shorter period of maturation than cabbage.

■ In light of what plaintiffs knew at the time, this decision was reasonable. On July 23, plaintiffs did not know, and had no reason to suspect, that the failure of field 10 was the result of a chemical kill. Plaintiffs had never suffered a chemical kill before. They first believed the crop failure may have been caused by a heat stress or crusting problem because they had had such problems in the past. Furthermore, defendant told plaintiffs that defendant had applied the proper chemicals as ordered by plaintiffs. Not until after the second planting of field 10 failed did plaintiffs suspect a chemical kill. Under these circumstances, plaintiffs' decision to replant field 10 and plant cucumbers on field 12 to keep to the harvesting schedule was not unreasonable. If not for the failure of the crops on field 10, field 12 would have been planted with the more profitable cabbage, not cucumbers. The trial court properly included in the damage award the lost profits from the 26 acres of field 12, minus the profits realized on the cucumbers.

Defendant next contends that the trial court erred in awarding plaintiffs $15,434.44 for lost profits to their trucking operation. Defendant argues that plaintiffs failed to prove this element of damages with a reasonable degree of certainty. While it is not necessary that damages for breach of warranty be calculated with mathematical precision (*Burrus v. Itek Corp.* (1977), 46 Ill. App. 3d 350, 360 N.E.2d 1168), basic contract theory requires that damages be proved with reasonable certainty and precludes damages based on conjecture or speculation (*Bockman Printing & Services, Inc. v. Baldwin-Gregg, Inc.* (1991), 213 Ill. App. 3d 516, 572 N.E.2d 1094).

In this case, plaintiffs established that the chemical kill not only resulted in lost profits on the cabbage, but also caused a loss of profits to their trucking operation. Plaintiffs presented evidence to show that the market price of cabbage at the time during which the affected field would have been harvested was $6 per package. This figure was used to calculate lost profits. However, this price reflected the market price for cabbage purchased at plaintiffs' farm. This did not include the profit plaintiffs make by hauling the cabbage to different parts of the country.

■ We find, however, that plaintiffs failed to present sufficient evidence to establish the amount of lost trucking profits with any degree of reasonable certainty. Ron Ouwenga compared the gross trucking revenue from November of "other years," apparently 1987, with that of November 1988, and determined that gross revenue in 1988

was down approximately $15,000. He attributed this decrease to the fact that plaintiffs had less cabbage to haul in November of 1988 because of the chemical kill. However, plaintiffs were unable to establish a net loss of trucking revenue. Plaintiffs failed to offer any evidence of savings they realized as a result of the kill, such as fuel, labor and other expenses associated with the operation of their trucking fleet. Moreover, no evidence was presented to show how much cabbage was raised in 1987 or any "other years." The evidence showed that the plaintiffs suffered through a severe drought in 1988. This may have affected plaintiffs' trucking revenue as compared to other years, especially in light of the fact that plaintiffs' revenues for grain hauling also decreased in 1988 by $20,000. Finally, no documented evidence of lost trucking profits was presented. The sum of the evidence concerning the amount of lost revenue consisted of the following testimony of Ron Ouwenga:

"Q. [Plaintiffs' attorney]: Did you—in fact, were you able to determine for the month of November of 1988 what the comparison of gross revenue was compared to these other years?

A. Yes.

Q. And how did the gross trucking revenue compare to these other various years?

* * *

A. Fifteen thousand dollars and something. I don't know the exact figure.

Q. So a number in excess of fifteen thousand dollars?

A. Yeah.

Q. Are you telling the Court this is the number that your trucking revenue was down for that one particular month?

A. For one month.

Q. Now, would all of this production have been done in just that one month?

A. Probably not the—probably—that's a minimum for that month. It probably would have began a couple of weeks in October, toward the end of October and probably extended into December may be a week.

Q. So the trucking revenue in general was down substantially more than fifteen thousand in the principal month?

A. Yeah. And that was the most clear cut number we could come up with. That month would have been all that cabbage, so—

Q. Would your gross revenues reflect the fact that you were able to find some other work for those drivers?

A. Yeah, somewhat.

Q. And, obviously, if you are not hauling cabbage and the trucks are sitting you would have saved gasoline. Were, in fact, the trucks sitting or being operated?

A. They were being operated when we could find work for them. The work that we established for them was short term. You know, we had it on short notice, so we couldn't lock in a good job. Much of the work and the main purpose of the work that we lined up was to keep the drivers busy. If we don't keep them busy we have to lay them off and they'll find a job else where.

Q. How would you compare the gross loss for November with what would have been the net loss? I mean, are you telling me that you really didn't save any expenses at all?

A. Maybe some, but not much. It would be difficult to determine any expenses we would have saved.

Q. Let's be generous now. About how much?

A. I don't know. I would say a couple thousand dollars maybe.

Q. So a net loss of at least thirteen thousand?

A. I would say that would be fair. The—now the work that we did line up for the drivers was—what I am saying is it was strictly—you know, most of that we didn't have planned. It was strictly to keep them busy. So for that work we may have not even broke even on that work. It's just strictly to keep them busy because they're available to us as employees.

Q. Whatever you generated by finding substitute work though, would have been reported in your gross revenues?

A. Yeah. That would be reported in the gross revenue.

Q. Even after that—reporting what that is, you still determined there is still a fifteen thousand plus loss?

A. Right. Right. And that—that number could be different too."

In our opinion, a simple comparison between plaintiffs' gross trucking revenue of November of 1988 and November of "other years" was an insufficient basis upon which to award damages. Without more evidence, an award based on that figure was purely speculative. Plaintiffs failed to establish with reasonable certainty the actual amount of lost profits suffered by its trucking operation as a result of defendant's breach of warranty. Accordingly, we reverse the trial court's award of $15,434.44 for lost trucking revenue.

■ Defendant next contends that the trial court erred in awarding plaintiffs $2,713.85 for "expenses associated with the kill." This damage award suffers from the same infirmity as the award for lost trucking revenue discussed above. The evidence presented at trial on this item was simply insufficient to determine the extent of plaintiffs' damages with any reasonable certainty. Plaintiffs presented no documentary evidence of this loss. The only evidence of these expenses consisted of a few brief statements in the testimony of Ron Ouwenga. He stated as follows:

"Q. [Plaintiffs' attorney]: Tell me what your expenses have been with regard to trying to determine the loss and what—what was the contaminate.

A. We were requested to put together a report, which I did, of—well, a loss report. It took several weeks of my time. We paid for the soil tests that were taken.

Q. Do you remember what that was?

A. The exact number I don't.

Q. What other expenses were there?

A. There are various administrative, office expenses, typing and things like that. Which this took several weeks. The paying for the experts to come in and look at the field.

Q. Did you pay them?

A. Well, we paid for entertainment for the day. Things like that."

We are again compelled to find that plaintiffs failed to prove the amount of their damages with reasonable certainty. The award of $2,713.85 for "expenses associated with the kill" is therefore reversed.

Finally, defendant contends that the trial court should not have awarded prejudgment interest. We agree that the award was improper. The trial court relied on section 2 of "An Act in relation to the rate of interest ***" (Ill. Rev. Stat. 1989, ch. 17, par. 6402) to award prejudgment interest on the damages attributable to the crop loss and the expenses associated with the kill. Section 2 provides:

"Creditors shall be allowed to receive interest at the rate of five (5) per centum per annum for all monies after they become due on any bond, bill, promissory note, or other instrument of writing; *** and on money withheld by an unreasonable and vexatious delay of payment." (Ill. Rev. Stat. 1989, ch. 17, par. 6402.)

Absent an agreement between the parties, prejudgment interest is properly awarded only when specifically provided for by statute (*Fen-*

*ton v. Board of Trustees* (1990), 203 Ill. App. 3d 714, 561 N.E.2d 105), and only if the damages are liquidated or subject to exact computation (*Alguire v. Walker* (1987), 154 Ill. App. 3d 438, 506 N.E.2d 1334).

■ Initially, we disagree with the trial court's finding that the damages in this case were "clearly and simply ascertainable by computation." Defendant had no way of knowing the extent of plaintiffs' damages prior to litigation of this case. In fact, plaintiffs submitted alternative measures of lost profit damages to the trial court in their closing argument. Moreover, our determination that the damage award for "expenses associated with the kill" was improper because those damages were insufficiently proven defeats the claim that damages were subject to exact computation. See *Alguire*, 154 Ill. App. 3d at 448, 506 N.E.2d at 1431 (court's determination that certain compensatory damage awards were improper defeated claim that damages were precisely measurable).

Even if the damages here were "simply ascertainable by computation," prejudgment interest was not warranted in this case. Under the statute, plaintiffs would be entitled to interest only in the event of an "unreasonable and vexatious delay of payment" by defendant. Clearly, no such delay occurred in this case. Neither a good-faith dispute concerning the existence of a legal obligation nor the defense of a lawsuit can be regarded as an unreasonable and vexatious delay of payment. (*Oldenburg v. Hagemann* (1991), 207 Ill. App. 3d 315, 565 N.E.2d 1021; *Edens View Realty & Investment, Inc. v. Heritage Enterprises, Inc.* (1980), 87 Ill. App. 3d 480, 408 N.E.2d 1069.) Here, it is apparent that defendant had a good-faith defense to liability. No action of defendant, other than defense of this suit, occasioned the delay in payment. For these reasons, we reverse the trial court's award of prejudgment interest.

In summary, we affirm the trial court's finding that defendant breached an implied warranty of merchantability. The award of damages in the amount of $137,957.62 for loss of the cabbage crop is affirmed. The damages awarded for expenses associated with the kill and loss of trucking revenue are reversed. The award of prejudgment interest is reversed.

Affirmed in part; reversed in part.

HAASE and McCUSKEY, JJ., concur.