**BERCO INVESTMENTS, INC., et al., Plaintiffs,**

v.

**EARLE M. JORGENSEN CO., et al., Defendants.**

**No. 94 C 3961.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 23, 1994.

---

Douglas P. Roller, Roller & Assoc., Naperville, IL, for plaintiffs.

Thomas Knepper, Neal, Gerber & Eisenberg, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Berco Investments, Inc. ("Berco") and its President and Chief Executive Officer Morando Berrettini ("Berrettini") have filed a seven-count Complaint against Earle M. Jorgensen Co. ("Jorgensen") and real estate broker John Earnhart, invoking federal jurisdiction on diversity-of-citizenship grounds. At the initial status hearing on August 10, 1994 this Court requested counsel for the litigants to submit letters identifying the authorities on which they respectively relied as to the viability or nonviability of Complaint Count I (asserting a breach of contract) and Count II (asserting a breach of an express covenant of good faith). Both letters have been submitted, with each of them containing a thoughtful exposition of the clients' legal position. Accordingly the issues are ripe for decision.

### Count I

Complaint Ex. A is a detailed (12–plus single-spaced pages) December 10, 1992 letter of intent (the "Letter") under which the parties negotiated for the possible purchase by Berco and sale by Jorgensen of real estate owned by the latter in Schaumburg, Illinois. This opinion's reference to a "letter of intent" immediately raises a red flag, for the Illinois cases [1] have given very mixed signals as to the enforceability of such pre-formal-contract documents.

To sustain its Count I breach of contract claim, Berco [2] seeks to rely on such cases

---

1. Both sides agree that Illinois law provides the rules of decision in this diversity action.

2. Although Counts I and II (like the other five counts) ask for relief in favor of "Plaintiffs," nothing said in either of the two counts now at issue supports any theory of recovery in favor of Berrettini individually. This opinion will therefore refer only to Berco throughout.

among that group as *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill. App.3d 383, 392, 160 Ill.Dec. 773, 780, 577 N.E.2d 1344, 1351 (1st Dist.1991) ("Letters embodying preliminary negotiations are enforceable in contract if it is clear that the ultimate contract will be substantially based on the terms of the letters and the parties intended to be bound") and *Empro Mfg. Co. v. Ball–Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir.1989) ("if the full agreement showed that the formal contract was to be nothing but a memorial of an agreement already reached, the letter of intent would be enforceable").[3] To much the same effect as *Weil* but perhaps a bit less demanding, *Chapman v. Brokaw*, 225 Ill.App.3d 662, 665, 167 Ill.Dec. 821, 824, 588 N.E.2d 462, 465 (3d Dist.1992) has put the matter in these terms:

> The fact that the parties may contemplate a more formal agreement will be executed in the future does not necessarily render prior agreements mere negotiations where it is clear that the ultimate contract will be based on terms substantially similar to those in the previous agreement.

■ It is really unnecessary to cite or quote from the cases on which Jorgensen relies (among them, other portions of the *Empro* opinion and cases cited there), because even under the cases on which Berco relies its argument is torpedoed by a whole series of terms in the Letter itself—terms that collectively negate the status of the Letter as a legally enforceable agreement. Instead of attempting to list those provisions in any descending order of significance, this opinion will refer to them sequentially as they occur in the document:

1. Quite apart from any possible inference from the Letter's opening clause in which Jorgensen says that it "summarize[s] the basic business terms upon which [Jorgensen] proposes to sell to [Berco]" (rather than "agrees to sell"[4]), the description of the property poses possible problems: It refers to "an approximately 25 acre parcel (the 'Improved Property') and an approximately 27 acre parcel of unimproved land (the 'Unimproved Property')." That, however, might be a surmountable hurdle. Unlike cases relied on by Jorgensen in that respect (*Alguire v. Walker*, 154 Ill.App.3d 438, 107 Ill.Dec. 279, 506 N.E.2d 1334 (1st Dist.1987) and *Calvary Temple Assembly of God v. Lossman*, 200 Ill. App.3d 102, 146 Ill.Dec. 122, 557 N.E.2d 1309 (2d Dist.1990)), if the approximately 52 acres represented Jorgensen's total acreage at the Schaumburg location and if the improved and unimproved parcels were readily identifiable from their appearance, the claimed uncertainty as to what real estate is the subject matter of the Letter would vanish.

2. That possible elimination of an element of uncertainty as to the parties' obligations under the Letter does not apply to Letter ¶ 1(a), which specifically provides for Berco's deposit of the earnest money on the Improved Property only "upon the execution of a definitive Purchase and Sale Agreement (the 'Improved Agreement')," and to the identical provision of Letter ¶ 2(a), which similarly requires the execution of a definitive "Unimproved Agreement" as a precondition to the deposit of earnest money. Both of those provisions literally tie Berco's contractual obligation to the *execution* of the *formal* contracts, with no such obligation existing before that event occurs.

3. In the same way, Letter ¶ 3 expressly conditions Berco's purchase obligations on a number of specified matters. Although each of them might perhaps be viewed as inconsistent with the notion of a currently binding contract, the most significant of those matters are (a) the provision that conditions Berco's obligation to close on its ability to obtain financing (Letter ¶ 3(c)) and (b) this provision of Letter ¶ 3(d):

> Buyer and Seller agreeing on the configuration of the 12 acre parcel (described in Section 5(a)(ii) below) and the Option Tract (described in Section 5(c) below)

---

3. *Empro* affirmed this Court's dismissal of a complaint based on a letter of intent.

4. Any such argument should carry no weight. Under conventional offer-and-acceptance notions, a "proposal" that is accepted unconditionally *becomes* a contract.

during the Contingency Period.[5] Buyer and Seller shall work diligently during the Contingency Period to determine a mutually acceptable configuration of the 12 acre parcel and the Option Tract. In light of that provision, the notion that the parties were contractually bound not only before signing the Agreements but also before resolving that condition is even harder to justify.

4. To the same effect, Letter ¶ 4 expressly conditions Jorgensen's obligation to close the sale on a number of matters as well. Among others, those conditions include a provision (Letter ¶ 4(e)) that is identical to the above-quoted Letter ¶ 3(d).

5. Finally, it is difficult to imagine a more unequivocal and less ambiguous provision than this final paragraph of the Letter:

> This letter is not a binding agreement, but a summary of the basic business terms upon which Seller proposes to sell the Property; provided, however, that the confidentiality provision in the foregoing paragraph is a binding and enforceable obligation of the Seller upon its execution of this letter. Neither Buyer nor Seller shall have any obligations with respect to the Property unless and until the Agreements are executed and delivered by Buyer and Seller. Nonetheless, Buyer and Seller agree to negotiate the Agreements in good faith and to use their best efforts to execute and deliver the Agreements by December 31, 1992. If for any reason the parties have not fully executed such Agreements by December 31, 1992, their obligations to negotiate shall terminate.

Although this Court has said that it would not seek to rank the significance of the Letter's provisions, it seems entirely fitting to conclude with the just-mentioned clincher.

In light of all of the cited provisions, it must be concluded that this case fits well within the doctrine exemplified by such federal cases applying Illinois law as *Empro* and *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217 (7th Cir.1988). In short, the Letter simply did not give rise to an enforceable contract between the parties.

If there were any room for doubt on that score (and this Court finds none), it would be dispelled by the parties' own post-Letter course of conduct that is set out at some length in the Complaint. In point of fact the parties continued to negotiate for nearly a full year past the December 31, 1992 deadline that had been specified in the Letter, and the proposed contract changed its shape markedly in a number of respects during that period of further negotiation (Complaint ¶¶ 34–49). Finally, according to Complaint ¶ 49:

> 49. On December 3, 1993, attorneys for Berco received correspondence dated December 2, 1993, from Bradley R. Beckstrom, attorney for defendant Jorgensen, enclosing the final version of the stock purchase agreement and lease.[6] The December 2, 1993 correspondence indicated that upon acceptance by Berco, the agreement would be submitted to the Jorgensen Board of Directors for execution. Berrettini immediately executed the documents enclosed in the December 2, 1993 correspondence and returned the executed documents to defendant Jorgensen.

Thus the conduct of the parties themselves negates any notion that they viewed the terms of their deal as having been fixed by the Letter, with the execution of ultimate papers being a mere formality. Instead the dealings between the parties ended in Berco's defeated expectations when Jorgensen's Board of Directors rejected the transaction

---

5. [Footnote by this Court] That term is defined as the 60–day period following execution of the formal Agreements. Again it is difficult to reconcile that contingency with the notion that the parties were bound when they signed the Letter—at a time *before* the formal Agreements were negotiated and signed.

6. [Footnote by this Court] One of the significant changes from the December 1992 Letter had

been the shift from a real estate transaction to one for stock in a corporation. What appears to be even more critical is that the proposed Stock Purchase Agreement (Complaint Ex. B) relates to the shares of a corporation owning *only* the 25–acre Improved Property. Berco is entirely silent as to just when and how the Unimproved Property apparently fell by the wayside in the post-Letter negotiations.

(Complaint ¶ 50), just as it had reserved the right to do (Complaint ¶ 49). Those defeated expectations are not actionable in contract terms, and Count I must be and is dismissed.

### Count II

 Count II asserts Jorgensen's breach of an "express covenant of good faith" (Complaint ¶ 60). For that purpose, it must by definition point to the good-faith-negotiation undertaking that was set out in the already-quoted final paragraph of the Letter. It is of course true that an obligation to negotiate in good faith may be imposed even if a letter of intent is insufficient to create a fully binding contract (*A/S Apothekernes Laboratorium v. I.M.C. Chem. Group, Inc.*, 873 F.2d 155, 158–59 (7th Cir.1989)). *Milex Prod., Inc. v. Alra Lab., Inc.*, 237 Ill.App.3d 177, 189, 177 Ill. Dec. 852, 860, 603 N.E.2d 1226, 1234 (1st Dist.1992) has more recently adopted the *A/S Apothekernes* statement of that obligation as a matter of Illinois law.

But the picture that is painted by Berco's own pleading demonstrates why Berco cannot invoke that doctrine, as exemplified by our Court of Appeals' treatment of the good-faith-negotiation obligation explained in *Feldman,* 850 F.2d at 1223 and reconfirmed in *A/S Apothekernes,* 873 F.2d at 158–59. As the latter case put it (*id.* at 158):

> The full extent of a party's duty to negotiate in good faith can only be determined, however, from the terms of the letter of intent itself. For example, our recent decision in *Feldman v. Allegheny International, Inc.,* 850 F.2d 1217 (7th Cir.1988), demonstrates how the terms of the letter of intent control the scope of the obligation to bargain in good faith.

Here the parties' obligation, as expressly defined in the Letter, was to negotiate in good faith during the brief period that remained in December 1992. They not only did that, but they also continued in their efforts to shape and reshape the proposed transaction for nearly a year thereafter. Thus the Complaint itself scotches Berco's effort to claim a breach of the express undertaking in the Letter. Count II is also dismissed.

### Conclusion

Complaint Counts I and II are dismissed for failure to state a cause of action. At the next status hearing (previously set for 8:45 a.m. August 31, 1994) the parties should come prepared to discuss the further proceedings in this action.