**In re ALTER–HALL CONSTRUCTION CO., INC., Debtor.**

**Thomas A. HICKEY, Trustee, Plaintiff,**

**v.**

**NIGHTINGALE ROOFING, INC., Defendant.**

**Bankruptcy No. 83–425–L.**
**Adv. No. 83–519.**

United States Bankruptcy Court, D. Massachusetts.

June 2, 1987.

---

Joseph G. Butler, Barron & Stadfeld, Boston, Mass., for plaintiff.

Peter Gagne, Corwin & Corwin, Boston, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The matter before the Court is the complaint filed on July 17, 1983 by the Trustee of Alter-Hall Construction Co., Inc. ("Alter-Hall" or the "Debtor"). The complaint seeks the turnover of $29,004.78 from Nightingale Roofing, Inc. ("Nightingale"), pursuant to 11 U.S.C. § 547(b). Prior to trial that was scheduled for April 6, 1987, the parties submitted a joint stipulation of facts, thereby obviating the need for the submission of evidence. At the April 6th hearing, the Court heard oral argument and directed the parties to submit briefs within a three week period.

## FACTS

Prior to the filing of the Chapter 7 petition on March 29, 1983, Nightingale, a roofing sub-contractor, performed several roofing jobs for Alter-Hall, a general contractor. Two projects, one known as the Hallston Plaza project and the other known as the Serono Labs project were among the roofing jobs performed by Nightingale for the Debtor.

Nightingale entered into a written subcontract with Alter-Hall, dated July 15, 1983, for roofing the Serono Labs, located in Randolph, Massachusetts, for a price of $50,000. The contract required periodic payments with a ten percent retainage to be held by the Debtor pending final completion. Except for completing punch list items and furnishing the manufacturer's roof guarantee, Nightingale had substantially completed the roof at Serono Labs by the end of December 1982.

Nightingale's contract at Hallston Plaza consisted of a proposal dated September 9, 1982, which Alter-Hall, through an agent, orally accepted. The proposal stated "Terms Net Completion" and provided for a ten year manufacturer's warranty. The agreed price was $26,800. Between September 9, 1982 and the end of December, 1982, Nightingale substantially completed the roof at Hallston Plaza except for certain punch list items. However, it had not provided the ten year manufacturer's guarantee required by the contract.

On December 24, 1982, Nightingale filed, in the Suffolk Superior Court, a "Complaint to Reach and Apply," accompanied by an affidavit executed on December 24, 1982 by John T. Nightingale, the president of Nightingale. The complaint alleged that Alter-Hall previously had made some payment on work performed by Nightingale on the Hallston Plaza project and sought judgment for the balance allegedly due to Nightingale on the contract. In his affidavit, Mr. Nightingale stated that, as of December 24, 1982, Nightingale had completed its work on the Hallston Plaza project with the exception of $4,300 worth of punch list items. He further stated that Nightingale had demanded payment from Alter-Hall on at least four occasions in the sixty days prior to the date of the affidavit. On December 28, 1982, George Alter, president of Alter-Hall, in connection with the state court litigation, executed an affidavit stating that Nightingale had not been paid by Alter-Hall because the roofing work was incomplete, the roof was leaking, and Nigh-

tingale had not provided the ten year roof guarantee.

On March 4, 1983, twenty-five days prior to the filing of the Chapter 7 petition, Alter-Hall delivered a check in the amount of $29,004.78 to Nightingale. On the same day, Nightingale and Alter-Hall executed a stipulation dismissing the action brought by Nightingale against Alter-Hall in the Suffolk Superior Court. The parties also exchanged releases.

With respect to the substantive aspects of the Debtor's preference claim, the parties agree that 1) the $29,004.78 payment was for debts incurred by Alter-Hall in the ordinary course of business; 2) that at the time the payment was made Alter-Hall was insolvent; and 3) that the payment enabled Nightingale to receive more than it would receive in a Chapter 7 proceeding.

After the commencement of this adversary proceeding, Nightingale returned the sum of $1,679 to the Trustee. This sum had been allocated to projects known as Synectecs, Heart Associates and Computer Devices and was returned because the payments for those projects were payments for antecedent debts incurred by Alter-Hall more than 45 days prior to the date of payment to Nightingale.

Of the remaining $27,325, $3,800 [1] was allocated to the Serono Labs project and $23,525 was allocated to the Hallston Plaza project. Nightingale has refused to return amounts allocated to these contracts because it believes the payments were not preferences subject to recovery by the Trustee. Of the $3,800 allocated to the Serono Labs contract, $2,500 was allocated to secure the future delivery of a manufacturer's roof guarantee required under the contract and $1,300.00 represented the balance due Nightingale for completion of the roofing work. Of the $1,300, $750 was subject to the assertion of an Alter-Hall repair claim by July 4, 1983.

Nightingale delivered the Serono Labs roof guarantee to Alter-Hall's attorney on May 19, 1983. Nightingale completed the

roofing work at the Serono Labs project on February 1 and February 2, 1983. Nightingale's counsel received no invoice from Alter-Hall concerning the repair claim by the specified date or at any time thereafter and the $750 remained in Nightingale's possession.

On the Hallston Plaza project, Nightingale performed work on punch list items and did corrective work during the week of January 31, 1983. Nightingale completed all punch list work on February 23, 1983. The roofing work was thereafter inspected and accepted. On February 18, 1983, Nightingale received the roof guarantee from the manufacturer and provided that guarantee to Alter-Hall. From the March 4, 1983 payment, Nightingale applied the remaining $23,525 to the balance due it on the Hallston Plaza project.

At the April 6, 1987 hearing, Trustee's counsel conceded that of the $3,800 allocated to the Serono Labs project $2,500 was to secure the future delivery of a roofing guaranty and that Nightingale performed approximately $1,300 worth of work on that project within 45 days of the date of payment. Thus, the Court is primarily concerned with monies allocated to the Hallston Plaza project.

## DISCUSSION

Section 547(b) provides:

Except as provided in subsection (c) ... the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made when the debtor was insolvent;

(4) made..within 90 days before the date of filing the petition ...

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were under chapter 7 of this title;

---

1. Alter-Hall's check incorrectly shows "LCA (H & A)" opposite the number $3,800. Nightingale never performed work for H & A and all parties acknowledged that the $3,800 was for Serono Labs.

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (emphasis supplied). Section 547(c) sets forth the elements necessary to establish transfers that may not be avoided by the trustee. Section 547(c)(2) as to which a dispute exists here provides:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).[2]

As this Court noted in *In re H & A Construction Co., Inc.,* 65 B.R. 213 (Bankr.D.Mass.1986), the burden of proving that all four elements of section 547(c)(2) have been met rests upon the defendant. *See also Matter of Foreman Industries, Inc.,* 59 B.R. 145, 153 (Bankr.S.D. Ohio 1986).

At the April 6, 1987 hearing, Nightingale's counsel argued that where the Hallston Plaza contract stated that its terms were "Net Completion" no liability or obligation existed on the part of Debtor until the contract was completed by Nightingale, despite the fact that prior payments were made, citing *LeBel v. McCoy,* 314 Mass. 206, 209, 49 N.E.2d 888 (1943); *see also In re Emerald Oil Co.,* 695 F.2d 833, 837 (5th Cir.1983); *Barash v. Public Finance Corp.,* 658 F.2d 504, 510 (7th Cir.1981); *In re Transpacific Carriers, Inc.,* 50 B.R.

649, 652 (Bankr.S.D.N.Y.1985). Trustee's counsel conceded this point.

The issue before the Court then is not whether the Debtor's debt to Nightingale was incurred in the ordinary course of the Debtor's business—the parties have so stipulated—but whether the transfer—the March 4, 1983 payment—was "made in the ordinary course of business or financial affairs of the debtor and the transferee" and was "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C) and (D).

Nightingale has glossed over this issue, emphasizing instead the undisputed fact that the payment of $23,525 to Nightingale on the Hallston Plaza project was made within 45 days of when the payment was due, i.e., on February 23, 1983, upon full completion of punch list items and repairs with respect to defective work. Nightingale argues that its December 1982 suit against the Debtor is not material because the mere assertion of a claim did not mature the debt or impose an obligation on the Debtor to pay. According to Nightingale, its right to payment and the Debtor's obligation to pay arose simultaneously on February 23, 1987 when Nightingale completed its performance.

The Trustee asserts that where a creditor commences a civil action to collect a debt, and payment is made by the debtor 25 days prior to the filing of a Chapter 7 petition, the payment was not made in the ordinary course of business or made according to ordinary business terms. The Trustee cites the legislative history of 11 U.S.C. § 547(c)(2) which indicates that the purpose of the subsection "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." Sen.Rep. No. 95–989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. &

---

**2.** Section 547(c)(2) was amended, eliminating the 45 day standard in subsection (B), by the Bankruptcy Amendments and Federal Judgship Act of 1984, Pub.L. No. 98–353. Section 553(a) of the 1984 Amendments states that "The Amendments made by this title shall become effective to cases filed 90 days after the date of enactment of the Act." The prior provisions of § 547 continue to be applicable to cases, such as this one, that were pending prior to October 8, 1984. 4 L. King *Collier on Bankruptcy,* § 547.03 (15th ed. 1987).

Admin.News 1978, pp. 5787, 5874. The Trustee also relies upon *In re Craig Oil Co.*, 785 F.2d 1563 (11th Cir.1986). In that case, the court found an unusual debt collection practice outside the scope of the section 547(c)(2) exception where the transferee had requested that the debtor make "a show of good faith" and had suggested that future payments be made by wire transfer, and the debtor acceded to the request thereafter making payments by cashier's checks, rather than previously used corporate checks. The court in *Craig Oil* observed that section 547(c)(2):

> [s]hould protect those payments which do not result from 'unusual' debt collection or payment practices. *To the extent that an otherwise 'normal' payment occurs in response to such practices, it is without the scope of § 547(c)(2).* Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must wonder whether the debtor's payment was in fact a response to those efforts.

785 F.2d at 1566 (emphasis supplied). *See also In re Daikin Miami Overseas, Inc.*, 65 B.R. 396, 398 (S.D.Fla.1986) ("payments made pursuant to a settlement agreement, which appear to be the result of an antecedent debt and prior dispute between the parties, are simply not in the ordinary course of business.")

In view of the fact that the work on the Serono Labs and Hallston Plaza projects was completed in response to the state court action and that the $29,004.78 payment was made on the same day that the parties agreed to dismiss the state court action and exchange releases, the Court is unable to conclude that that payment was made in the ordinary course and according to ordinary business terms. Accordingly, Nightingale is hereby ordered to forthwith turnover the sum of $24,825.78 ($23,525 plus $1,300) to the Trustee.