**In re PEARSON INDUSTRIES, INC., Debtor.**

**Richard E. BARBER, Chapter 7 Trustee for Pearson Industries, Inc., Plaintiff,**

v.

**BETTENDORF BANK, N.A., Defendant.**

**Bankruptcy No. 89–81684.**

United States Bankruptcy Court, C.D. Illinois.

March 15, 1993.

See also 147 B.R. 914.

Barry M. Barash, Barash, Stoerzbach & Henson, Galesburg, IL, for plaintiff.

Roger L. Strandlund and James S. Zmuda, Califf & Harper, P.C., Moline, IL, for defendant.

U.S. Trustee, Peoria, IL.

## OPINION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

PEARSON INDUSTRIES, INC. (PEARSON) and INDUSTRIAL & MUNICIPAL ENGINEERING, INC. (IME) were, through common ownership, related corporations engaged in separate manufacturing businesses.  On August 20, 1981, PEARSON, as borrower, IME, as one of several guarantors, the Bettendorf Bank & Trust Company (BANK), as lender, and the Farmers Home Administration (FMHA), as the lender's 90% guarantor, entered into a loan and security agreement for $4,500,-000.[1]

On August 16, 1984, PEARSON, IME, and other related corporations filed separate Chapter 11 cases in bankruptcy.  Pertinent portions of PEARSON's Second Amended Plan provided as follows:

---

1.  At that time PEARSON's corporate name was The Pearson Bros. Company, Inc.

*ARTICLE I—Definitions*

1.10 *Class A Preferred Stock.* The shares of preferred stock of The Pearson Bros. Company, Inc. which will be issued to the Class 4 Creditor pursuant to the Plan. Each share of Class A Preferred Stock shall have a stated value of one dollar ($1.00). ... The Class A Preferred Stock held by the Class 4 Creditor shall be Mandatorily redeemable by The Pearson Bros. Company, Inc. by payment of the stated value. The Debtors shall contribute the net amount of twenty percent (20%) of the Consolidated Pretax Profit (or loss) plus twenty percent (20%) of IME's Pretax Profit (or loss) toward the retirement of the Class A Preferred Stock each year until the stock is retired. Redemption will be made within seven (7) days after the receipt of a fiscal year-end certified audit, and in any event, no later than 90 days after the close of the fiscal year, beginning with the fiscal year ending March 31, 1985. The Class 4 Creditor shall be issued 20% of all issued and outstanding Class A Preferred Stock.
. . . .

1.18 *Consolidated Pretax Profit.* The consolidated profit (or loss) of all four Debtors before payment of federal corporate income taxes and before application of carryforwards or carrybacks. Consolidated Pretax Profit shall be determined in accordance with the Internal Revenue Code and the regulations and procedures promulgated thereunder and in accordance with generally accepted accounting principles consistently applied from year to year. ...
. . . .

1.26 *IME Pretax Profit.* The profit (or loss) of Industrial & Municipal Engineering, Inc. before payment of federal corporate income taxes and before application of carryforwards or carrybacks. IME Pretax Profit shall be determined in accordance with the Internal Revenue Code and the regulations and procedures promulgated thereunder and in accordance with generally accepted accounting principles consistently applied from year to year. ...
. . . .

ARTICLE IV

*Claims Impaired Under the Plan*

. . . .

4.4. *Class 4 Claim.* The Allowed Class 4 Claim of the Bettendorf Bank and Trust Company and the Farmers' Home Administration (collectively, the "Bank") shall be paid as follows: The existing note and loan and security agreement between the Debtors and the Bank shall be amended to a principal amount of three million dollars ($3 million) secured by a first lien on all of the Debtors' land, buildings, machinery, equipment, office furniture and fixtures, and a lien on the Debtors' accounts receivable and inventory subordinate to the liens of Security Pacific Business Credit, Inc., Borg–Warner Acceptance Corporation, and any subsequent lender or lenders selected by the Debtors. The amended note and loan and security agreement shall be payable as follows: $2.2 million shall be amortized over a period of 30 years and shall accrue interest for the first three years at a rate of forty percent (40%) of the Prime Rate, and for the second three years at a rate of sixty percent (60%) of the Prime Rate, and after the sixth year at a rate equal to the Prime Rate. The principal will be repayable in three hundred sixty (360) equal monthly installments. The accrued interest shall also be payable monthly. The remaining $800,000.00 shall be amortized over a period of ten years and shall bear interest at the same rates described above. The principal will be repayable in one hundred twenty (120) equal monthly installments. The accrued interest shall also be payable monthly. Interest and principal payments will begin one month following the Consummation Date.

Finally, in consideration for amending its note and loan and security agreement, the Bank shall receive four hundred thousand (400,000) shares of Class A Preferred Stock of The Pearson Bros. Company, Inc.

## ARTICLE VIII

### *Governing Law*

Except to the extent that a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and Bankruptcy Rules, Illinois law shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, and the rights and obligations of any parties under the Plan, except to the extent that such agreements, documents and instruments themselves provide for different governing law.

The Plan also provided for an infusion of new capital, a transfer of ownership, and new management. Gerald Gidwitz (GIDWITZ) provided the new capital and GIDWITZ's children and other members of his family became PEARSON's stockholders.[2] The Board of Directors consisted of GIDWITZ and his five children. GIDWITZ was chairman of the Board of Directors. James D. Stearns (STEARNS), who had previously been employed by GIDWITZ in other capacities, became the president and chief executive officer, managing PEARSON.

On October 1, 1984, an order confirming the Plan was entered which provided in part as follows:

2. The provisions of Chapter 11 of the Code have been complied with; that the plan has been proposed in good faith and not by any means forbidden by law;

On that same day PEARSON, IME, BANK and FMHA entered into an amended loan and security agreement which tracked the confirmed plan of reorganization and provided that PEARSON's debt to the BANK was to be reduced to $3,000,000. $2,200,-000 was to be repaid in monthly payments amortized over thirty years. $800,000 was to be repaid in monthly payments amortized over ten years. In addition to those amortized monthly payments, PEARSON was to pay the BANK service fees of $2,000 per month. The BANK also received 400,000 shares of PEARSON's Class

A Preferred Stock. The portion of the amended loan and security agreement pertinent to the Class A Preferred Stock provided as follows:

(c) The Bank shall receive 400,000 shares of Class A Preferred Stock of the Borrower, representing 20% of all issued and outstanding Class A Preferred Stock.

(i) Each share shall have a stated value of $1.00, which shall be mandatorily redeemable by Borrower by payment of the stated value out of the combined profits of the Borrower and the other 4 debtors identified in the Plans (collectively referred to as the "Debtors"). The Debtors shall contribute the net amount of 20% of the Debtors Consolidated Pretax Profit (or loss) plus or minus 20% of IME's Pretax Profit (or loss) each year toward the retirement of the Class A Preferred Stock until it is retired. Redemption shall be made within 7 days of the receipt of a fiscal year-end certified audit, and in any event, no later than 90 days later than the close of the fiscal year, beginning with the fiscal year ending March 31, 1985. . . .

In order to comply with the requirements of the Illinois Business Corporation Act of 1983 (CORPORATION ACT), Ill.Rev.Stat. ch. 32 § 1.01 *et seq.*, PEARSON also filed a report with the Illinois Secretary of State indicating that PEARSON was authorized to issue Class A Preferred Stock, which report provided in part as follows:

1. *Class A:* The Class A Preferred Stock shall be mandatorily redeemable in accordance with the Illinois Business Corporation Act by the Corporation by payment of the stated value from the net amount of twenty percent (20%) of the Corporation's consolidated pretax profit plus twenty percent (20%) of the pretax profit of Industrial and Municipal Engineering, Inc., an Illinois corporation, toward the retirement of the Class A Preferred Stock each year until the stock is retired. . . .

---

**2.** GIDWITZ is a businessman with a variety of business interests. For example, he is the founder of Helene Curtis.

More than five years passed after PEARSON's Chapter 11 reorganization. PEARSON then fell behind on its payments to the BANK and on January 12, 1989, the BANK and PEARSON entered into a second loan modification agreement to immediately pay delinquent interest and services fees only and to extend the monthly payments of principal and interest for ninety days. The second loan modification agreement provided in part as follows:

Therefore, in consideration of ten dollars ($10) and other valuable consideration, it is hereby agreed as follows:

1. As of January 2, 1989, the unpaid principal balance of said indebtedness is $2,386,666.56.

2. Interest and service fees, only, shall be due for the monthly payments on November 2, 1988, December 2, 1988, and January 2, 1989. Such monthly interest and service fees are now unpaid as follows:

| | |
|---|---|
| (a) Note number 1: | $ 7,403.84 |
| (b) Note number 2: | $29,389.58 |
| (c) Service fees: | $ 6,000.00 |
| TOTAL | $42,793.42 |

3. The unpaid monthly interest and service fees in the total amount of $42,793.42 shall be paid in full by the undersigned on the signing hereof.

4. On February 2, 1989, monthly payments of principal and interest shall revert to those set forth in the promissory note as amended, and such monthly payments shall be extended three (3) months with final payments of all principal and accrued interest due ninety (90) days from the dates as previously calculated under the promissory note as amended.

5. In all other respects said promissory note and loan and security agreement as amended, and the collateral documents shall remain in full force and effect.

On January 20, 1989, PEARSON paid the BANK $42,791.42, which is approximately the amount required by Paragraph 3 of the second loan modification agreement. Subsequently, on February 17, 1989, PEARSON made a payment to the BANK of $27,548.09. No payment was made during March of 1989. On April 27, 1989, PEARSON made another payment to the BANK in the amount of $26,645.72. PEARSON's next payment to the BANK was made May 16, 1989, in the amount of $28,787.69. No payments were made in June or July of 1989. Between August 1 and August 29 of 1989, PEARSON paid the BANK $71,-741.54 for interest due on the 1984 amended loan and security agreement as modified by the second loan modification agreement.

PEARSON's financial condition was reported on unaudited internally prepared financial statements. On March 31, 1986, based on these kinds of financial statements, PEARSON paid the BANK $104,-052.00 to redeem 104,052 shares of PEARSON's Class A Preferred Stock.

Prior to the time for the 1987 stock redemption, GIDWITZ became suspicious that the unaudited internally prepared financial statements were not accurate. In February of 1987, at a stockholders meeting, GIDWITZ told STEARNS not to make the 1987 stock redemption until a certified audit, which GIDWITZ had ordered, was received. On March 11, 1987, GIDWITZ sent STEARNS a memorandum directing him to delay the 1987 stock redemption until the certified audit was received. STEARNS replied, stating:

The stock redemption program was announced on 3/4/87. This program is a duplicate—timing wise, of last year's. Our checks are payable on 3/31/87. Many of the stockholders have already submitted their shares.

When GIDWITZ received STEARNS' memorandum, he sent another memorandum to STEARNS, stating in part:

Under no circumstance should any redemption notices have been sent without the prior review of the directors particularly when this very issue was specifically discussed. Because of this development, we are having the lawyers review the question as to what our obligations

are in the event profits prove to be lower than represented.

This last memorandum was followed by a telephone call from GIDWITZ to Jim Shook (SHOOK), PEARSON's inhouse accountant and controller who reported to STEARNS, with GIDWITZ ordering SHOOK not to mail the stock redemption checks. STEARNS countermanded GIDWITZ' order and the checks were mailed. The BANK received a check for $213,206.00 for the 1987 redemption of 213,206 shares of PEARSON's Class A Preferred Stock.

On October 16, 1989, an involuntary bankruptcy petition under Chapter 11 was filed against PEARSON. On October 31, 1989, an order for relief was entered against PEARSON under Chapter 11 of the Bankruptcy Code, and IME filed its own voluntary Chapter 11 case under the Bankruptcy Code. Subsequently, both cases were converted to Chapter 7 cases. After the conversions PEARSON's trustee in bankruptcy brought a two-count complaint against the BANK. Count I is to recover the $71,741.54 in interest only payments made to the BANK by PEARSON, as preferential payments under § 547 of the Bankruptcy Code, 11 U.S.C. § 547. Count II involves the 1987 redemption of PEARSON's Class A Preferred Stock and seeks to recover the $213,206.00. The Trustee seeks to recover that sum under Section 544(b) of the Bankruptcy Code, 11 U.S.C. § 544(b), which permits a trustee to avoid a transfer voidable under state law, and under Ill.Rev.Stat. ch. 59, ¶ 4 and ch. 30, ¶ 202 as a fraudulent conveyance. Alternatively, among other theories, the Trustee seeks to avoid the 1987 redemption as (1) a violation of ¶ 9.10 of the CORPORATION ACT which governs distributions to shareholders and (2) because it was not made in accordance with the terms of the confirmed plan. The trustee also seeks prejudgment interest under both counts.

The BANK does not raise any issues under § 547(b) as to the existence of a preference. The joint pretrial statement indicates the only issue under § 547 is whether the "ordinary course of business" exception of § 547(c) is applicable. While in its post-trial brief the BANK states that

the trustee has the burden of proof as to each element under § 547(b), it does not indicate where the trustee's proof is lacking. Rather, in both the post-trial brief and its reply to the trustee's post-trial brief the BANK continues to rely on the "ordinary course of business" exception to protect the interest only payments.

■ In order to protect the interest only payments under the "ordinary course of business" exception of § 547(c)(2), the BANK has the burden of proving each of the following elements:

1. That the payment was "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;"

2. That the payment was "made in the ordinary course of business or financial affairs of the debtor and the transferee;" and

3. That the payment was "made according to ordinary business terms;"

■ Preliminary to deciding if these three elements are present in this case, it must be determined whether under § 547(c)(2) the "ordinary course of business" exception involves the application of an objective or subjective test, or a combination of the two. In raising the issue the BANK argues for the subjective test or a combination test, and that regardless of which test is applied, it has met its burden of proof.

This Court has considered this same issue in both *Barber v. Riverside Int'l Trucks, Inc.*, 142 B.R. 831 (Bkrtcy.C.D.Ill. 1992) and *In re Hills Oil & Transfer, Inc.*, 143 B.R. 207 (Bkrtcy.C.D.Ill.), where, in adopting the objective test, stated:

Adopting the subjective test requires subsections 547(c)(2)(B) and (C) to be read identically and thereby ignore subsection (C) or render it superfluous. *See* 1 Robert E. Ginsberg, *Bankruptcy; Text, Statutes, Rules*, 2d ed., (P.H.1991), Part VIII, Sec. 8.03(c), p. 616. This Court does not believe that Congress would include a superfluous element and that in order to give meaning to all these

elements the subjective test is required. This Court agrees with the court in *In re Loretto Winery, Ltd.*, 107 B.R. 707 (9th Cir. BAP 1989) where the court stated:

It was the conclusion of the trial court that the third of these conditions, subparagraph (C), embodied an objective standard to be shown by the custom in the industry in which the transferee and debtor are engaged. We agree, for to graft upon the relevant terms anything but an objective yardstick would either ignore the operative nomenclature altogether, thereby making it a nullity, or interpret it in a manner which duplicates the requirement of subparagraph (B), thereby making it superfluous. (Citation omitted) Such a construction would run contrary to settled principles of construction by impermissibly rendering the statute inoperative or superfluous, and by failing to give effect to all the words employed by Congress. (Citations omitted)

While it is true that the decided cases are split on whether the test is subjective or objective in nature, and that at one point in time the majority position adopted the subjective test (*see Ginsberg, supra*) it no longer is true. Commenting upon this shift in favor of the objective test, the court in *In re Hancock–Nelson Mercantile Co., Inc.*, 122 B.R. 1006 (Bkrtcy.D.Minn.1991) stated:

In one of the more frequently-cited decisions applying section 547(c)(2), the court termed [the subjective test] the "majority" approach. *See In re Steel Improvement Co.*, 79 B.R. 681, 638–84 (Bankr.E.D.Mich.1987). *See Also In re Unimet Corp.*, 85 B.R. 450, 453 (Bankr.N.D.Ohio 1988). A strict headcount of decisions extant at the time supports this characterization. Since then, enough other courts have adopted the alternate test that the characterization is no longer correct. *See In re Loretto Winery, Ltd.*, 107 B.R. 707, 710 (Bankr. 9th Cir.1989) (characterizing the alternate rule as the "majority" rule). The court in

*Steel Improvement Co.* itself adopted the then-"minority" rule.

In *Matter of Century Brass Products, Inc.*, 121 B.R. 136 (Bkrtcy.D.Conn.1990), the court also stated that "a majority of jurisdictions now agree that 'ordinary business terms' in subdivision (C) refers to 'an objective standard to be shown by the custom in the industry in which the transferee and debtor are engaged' ", citing *Loretto Winery, supra*. [Footnote]

---

*FN* The subjective test, now clearly representing the minority view, still finds some support. In *In re Equipment Co. of America*, 135 B.R. 169 (Bkrtcy.S.D.Fla.1991), the court rejected the debtor's contention that the third condition contained in section 547(c)(2)(C) that the payment be "made according to ordinary business terms" is only satisfied if the payments conform to the ordinary business terms of the industry, and not simply those between the parties:

In [*In re*] *Southern Commodity* [78 B.R. 626], the court required that payments be made according to terms ordinary in the industry. However, reading 11 U.S.C. section 547(c)(2)(C) as requiring compliance with terms ordinary in the industry would negate any benefit the exception would convey. That reading would require that the parties conduct themselves according to business norms, restricting their chosen course of dealing to an industry standard. The exception was created to allow debtors and creditors to continue in their normal course of business, and "discourage unusual action by either the debtor of his creditor during the debtor's slide into bankruptcy." *In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir. 1986). To hold otherwise would be to place the exception out of reach of all those debtors and creditors for whom it was written.

■ Applying the objective test, for the following reasons, this Court finds that the interest only payments were not made in the "ordinary course of business." First, the debt was not incurred in the ordinary course of business or financial affairs of both PEARSON and the BANK. While it is true that the original loan of $4,500,-000.00 made in 1981 would meet that element, it must be remembered that the original loan amount and its terms were substantially modified through the 1984 bankruptcy and amended loan and security agreement and that modification was also subsequently modified in 1989 to permit the curing of a default. A loan obligation substantially modified through bankruptcy

and subsequently modified a second time while in a default status can hardly be said to have been incurred in the ordinary course of business.

Likewise, it cannot be said that the interest only payments were made in the ordinary course of PEARSON's and the BANK's business or financial affairs. This is not a case where a debtor and a creditor have fallen into a pattern of regularly paying and accepting payments on a late basis. For example, a debtor who over a period of time regularly pays his accounts payable 60–90 days late which the creditor has come to expect and accepts have been held to be payments in the "ordinary course of business." *See In re Decor Noel Corp.,* 134 B.R. 883 (W.D.Tenn.1991); *In re Service Bolt & Nut Co., Inc.,* 97 B.R. 892 (Bkrtcy.N.D.Ohio 1989). In this case no such pattern existed as to the amount, the timing or the application of payments made to the BANK. Starting in November of 1988 PEARSON fell behind in its loan payments of principal and interest. This led to the second loan modification in January of 1989 and payment of interest and service fees only in the amount of $42,791.42. The second loan modification did not require principal payments for the period in default. PEARSON then began making sporadic loan payments of principal and interest, paying $27,548.09 in February of 1989, omitting any loan payment in March of 1989, paying $26,645.72 and $28,787.69 in April and May of 1989 respectively, with no loan payments being made in June or July of 1989.

When PEARSON stopped paying in June of 1989, the BANK pressed for payment. The BANK's comment sheets reflect a meeting in June of 1989 where the BANK officer indicated:

On Monday, June 26, I met with the active management of Pearson Industries. Present at this meeting were myself, Jerry Townsend from FmHA, and Mike Gibbons, President, Tom Evans, Vice President/Finance and Dick Jewel, Assistant to Mike Gibbons, from the company. Pearson presently owes $2,385,833.58 on the FmHA note and $102,642.62 on their mortgage note. The discussion today was concerning the FmHA note, which is presently two payments past due. We reviewed the operation of the company.

\* \* \* \* \* \*

Pearson has lost about $500,000 the first five months of operation. The Gidwitz family, according to management, has loaned the company approximately $1,800,000 since 1984, including the initial capital of $50,000. The management group believes that the Gidwitz family will continue to cover the additional cash needs of the company. The management believes there are several alternatives to the company becoming profitable.

1. Bring more produce lines into the company to increase the volume.

2. Merge Pearson into another company to build sales for that company.

3. Liquidate the company assets to retire debt.

At this time they are not sure which course the company will follow. Management has also expressed a desire to buy the company from Pearson Sales under some restructured basis with the family.

The comment sheets also reflect the BANK continued to press for payment in July of 1989, as they indicate:

On July 12, 1989, I contacted Tom Evans, the new controller for Pearson Industries concerning their FmHA loan which became ninety days past due on July 2, 1989. They are currently past due $38,333.34 on principal, and $44,294.45 on interest.

\* \* \* \* \* \*

I also told Evans we could not extend the note without the interest paid current. I gave him the following options:

1. We would consider a ninety day extension on principal if the interest was brought current and interest was paid monthly.

2. The company provide alternative collateral which could be

(a) Gerald Gidwitz's personal signature;

(b) Some other collateral that could be liquidated such as CDs or stock;

3. A voluntary liquidation by the owners of the company;

4. Bankruptcy.

In response to the BANK's demands PEARSON began to make interest only payments in August of 1989. The first of the interest only payments was made on August 1, 1989, in the amount of $40,-048.13 to cover interest due in May, June and July of 1989. Two weeks later, on August 16, 1989, the second interest only payment of $10,674.45 was made, and another two weeks later, on August 29, 1989, the third interest only payment of $21,-038.96 was made. These latter two interest only payments were also applied to past due interest.

When PEARSON began missing the regular monthly loan payments of principal and interest in November of 1988, PEARSON clearly was reaching the end of its financial rope. PEARSON's financial condition had reached the stage where it was not a matter of making the regular monthly loan payments of principal and interest on a regular and timely, or regular but late, basis. PEARSON couldn't make the loan payments required by the amended loan agreement, which led to the second loan modification in January of 1989. Nor could PEARSON make the payments required by it. Instead, PEARSON made erratic loan payments in February, April and May, no payments in March, June or July, and three interest only payments in August, with the three interest only payments being inconsistent as to amount and timing with what was required under the loan documentation. Interest normally was paid monthly and was approximately $14,000.00 per month.[3] The payments which the Trustee seeks are for past due interest totaling $71,741.54 paid by three payments in a thirty day period. It is just

as clear that the BANK recognized PEARSON's financial condition and pressed for whatever payments it could get, even suggesting liquidation or bankruptcy. The three interest only payments were not in the "ordinary course of business," but were last ditch efforts to keep the business afloat for as long as possible until the inevitability of bankruptcy occurred.

■ Finally, the payments cannot be considered to have been made according to ordinary business terms. Here the BANK relies on its then president's testimony to the effect that the payments were according to ordinary business terms as the banking industry's standard for determining ordinary business terms for delinquent loans is a bank-by-bank, loan-by-loan standard. The argument is self-defeating. While this Court would agree that banks consider delinquent loans on an individual basis, this Court does not agree that such a standard leads to the conclusion that interest payments on a delinquent loan are payments according to ordinary business terms. That standard leads to the opposite conclusion that payments on delinquent loans can't be considered as being in the "ordinary course of business." The banking industry's standard recognizes that a delinquency is not an ordinary business event. So it follows that a payment on a delinquency is not a payment in the "ordinary course of business."[4]

While the concept of the "ordinary course of business" exception has been extended to cover situations not originally thought to be covered, applying it to the facts of this case would be tantamount to eliminating the preference concept. To hold for the BANK would require this Court to find the three interest only payments made within a thirty day period and applied to past due interest are ordinary late payments on an ordinary loan modification arising from an ordinary default on

---

**3.** The interest would vary from month to month as the interest rate was a variable one. At the time PEARSON was paying approximately $2,500.00 interest per month on the $800,000.00 portion of the loan and $9,500.00 interest per month on the $2,200,000.00 portion of the loan, and $2,000.00 per month for service fees.

**4.** Even if this Court applied the subjective test or a combined test, the BANK would still not be successful in claiming the "ordinary course of business" exception, as it failed to prove the first two elements of the exception.

an ordinary rewrite of a loan through an ordinary bankruptcy.

Several reported cases have considered § 547(c) in the context of a workout situation. In *In re Roblin Industries, Inc.*, 127 B.R. 722 (Bkrtcy.W.D.N.Y.1991), the debtor and creditor had entered into an agreement to pay off an indebtedness in excess of $700,000.00 by the debtor making payments of $50,000.00 per month with interest at 10% and future deliveries to be paid for in cash on receipt. Rejecting the creditor's view, the court stated:

> Assuming that the agreement between the debtor and Ford to handle debtor's delinquent debt may meet 2(A) and (B), the Court believes that there is no doubt but that it fails (C). Ford relies upon *In re Magic Circle Energy Corp.*, 64 B.R. 269 (Bankr.W.D.Okl.1986), and *In re Gilbertson*, 90 B.R. 1006 (Bankr.D.N.D. 1988) to support the contrary argument.
>
> The notion that a delinquent debt, whether being repaid pursuant to formal agreement or not, could be viewed as being made according to ordinary business terms would stand preference theory on its head. The very genesis of the agreement is a failure to pay according to ordinary business terms. Thus, this transaction does not fall within the ordinary course exception. *See In re Craig Oil Co.*, 785 F.2d 1563, 1567 (11th Cir. 1986); *Barash v. Public Finance Corp.*, 658 F.2d 504, 511 (7th Cir.1981); *In re Gold Coast Seed Co.*, 24 B.R. 595, 597 (9th Cir. BAP 1982); *In re Gull Air, Inc.*, 82 B.R. 1, 3 (Bankr.Mass.1988).

In *In re Gull Air, Inc.*, 82 B.R. 1 (Bkrtcy.D.Mass.1988), the creditor argued that it was within its ordinary business practice to enter into workout agreements. Rejecting the creditor's position given the facts of the case, the court stated:

> Beech cites *In re Magic Circle Energy Corp.*, 64 B.R. 269 (Bankr.W.D.Okl.1986), in support of its position. In that case, the debtor entered into a workout agreement with its creditors, including the preference defendant, approximately two years prior to the filing of its bankruptcy petition. As part of the workout arrangement, the debtor and the defendant agreed to restructure the debtor's outstanding debt. Accordingly, the debtor executed a promissory note providing for the payment of monthly installments to the defendant over a seven year period. The Bankruptcy court concluded that "the mere restructuring of the payment terms does not alter the fact that the underlying debt was incurred under normal circumstances." *Id.* at 273. It also found that, in view of mutual benefit derived from the workout and the exchange of services for payment, the transactions were neither unusual nor extraordinary. *Id.* at 274. Finally, it took judicial notice that the terms of the workout were well within ordinary business terms.
>
> Given the magnitude of the payments in question, the Court understands Beech's position. Indeed, the Court has no serious reservations about Beech's arguments with respect to subsections 547(c)(2)(A) and (C). However, the Court is unconvinced by its legal argument with respect to section 547(c)(2)(B). As Gull correctly points out, Beech overlooks the fact that the transfers pursuant to the workout agreement were in response to the civil action and were not consistent with the prior transactions between the parties. Notably, an additional $80,000 was required for the payment of arrearages and the payments were made directly from Gull's airline clearing house account.

In *Matter of Craig Oil*, 785 F.2d 1563 (11th Cir.1986), the Court of Appeals for the Eleventh Circuit stated:

> It seems clear ... that section 547(c)(2) should protect those payments which do not result from 'unusual' debt collection or payment practices. *To the extent an otherwise 'normal' payments occurs in response to such practices, it is without the scope of section 547(c)(2).* Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts.

785 F.2d at 1566. *See also In re Alter Hall Construction Company Inc.*, 73 B.R. 989 (Bankr.D.Mass.1987). The connection between the payments and the dismissal of the civil action instituted by Beech in Kansas is explicitly stated in the workout agreement. In view of its prior opinion in *In re Alter Hall* and the purpose of section 547(c)(2), the Court cannot overlook that connection. Moreover, the case most heavily relied upon by Beech, *In re Magic Circle Energy Corp., supra,* is factually distinguishable in key respects. In the reported decision, there was no suggestion that a civil action had been commenced prior to the execution of the workout agreement. Moreover, in that case, unlike the instant proceeding, the workout agreement governed the relationship between the parties for at least one and one half years instead of less than six months.

A contrary result was reached in *First Software Corp. v. Micro Educ. Corp. of Amer.*, 103 B.R. 359 (D.Mass.1988), where the court held that payments made by the debtor under an agreement with the creditor to make larger weekly payments until the balance on the account was reduced to zero, were transfers within the ordinary course of business. The court stated that there was no evidence which indicated that the creditor knew that the debtor was on the verge of bankruptcy when the payments at issue were agreed upon and made. However, that case is factually distinguishable from the facts of this case as here the BANK's comment sheets disclose that the BANK was pressing for the delinquent payments and that it was suggesting bankruptcy was an option.

Count II of the trustee's complaint attacks the 1987 redemption under a variety of theories. At the trial extensive and detailed evidence was introduced and arguments made involving appropriate accounting procedures and the Debtor's solvency. Specifically, the parties addressed the issue of whether PEARSON's inventory reserve should have been based upon last in/first out (LIFO) or first in/first out (FIFO). These two factors tend to cloud the issues under Count II. This evidence and these arguments are relevant to the Trustee's theory under the Illinois Fraudulent Conveyance laws, as well as the Trustee's theory that the 1987 redemption violated ¶ 9.10(c) of the CORPORATION ACT, as one of the elements the Trustee has to prove under both of these theories was PEARSON's insolvency. *See In re Chicago, Missouri & Western Ry. Co.*, 124 B.R. 769 (Bkrtcy.N.D.Ill.1991); *Alan Drey Co. v. Generation, Inc.*, 22 Ill.App.3d 611, 317 N.E.2d 673 (1st Dist.1974). But they are not relevant to the Trustee's theories that the redemption was void under the CORPORATION ACT because it was made without authorization of the Board of Directors or that the redemption violated the terms of the confirmed plan of reorganization, as the Trustee is not required to prove insolvency to prove his case under these latter two theories. The issue under these latter two theories is whether the 1987 redemption was authorized by the Board of Directors and whether the funds for the redemption came from "pretax profits" determined in accordance with the Internal Revenue Code and Regulations and generally accepted accounting principles consistently applied from year to year. Under the plan of reorganization redemption was required regardless of its impact on PEARSON's solvency. What was contained in the plan of reorganization was a prescribed formula for the redemption that was mandatory on PEARSON and the BANK. There is no mention of solvency in the plan of reorganization. Count II boils down to several simple concepts and can be decided for the Trustee based on his theories as an unauthorized redemption under the CORPORATION ACT and for violation of the terms of the confirmed plan of reorganization.

The starting point is to recognize that the plan of reorganization, to be confirmable under § 1129(a)(3) of the Bankruptcy Code, 11 U.S.C. § 1129(a)(3), could not by any means be forbidden by law. This concept was acknowledged by the court's confirmation order finding the plan of reorganization was not forbidden by law.

■ The next point that needs to be recognized is that once the Chapter 11 plan was confirmed and consummated, PEARSON was free of the bankruptcy court and was expected to function as any other business entity, under its own power in its usual ways of conducting business, without judicial restraint or interference, complying with all applicable laws and its agreements. This concept can be inferred from the Seventh Circuit Court of Appeals opinion in *Pettibone Corp. v. Easley*, 935 F.2d 120 (7th Cir.1991) where it stated:

> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the *protection* of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens. (Citations omitted.) Formerly a ward of the court, the debtor is emancipated by the plan of reorganization. A firm that has emerged from bankruptcy is just like any other defendant in a tort case: it must protect its interest in the way provided by the applicable non-bankruptcy law, here by pleading the statute of limitations in the pending cases.

One of its agreements that it had to comply with was its plan of reorganization. One of the laws which PEARSON and its creditors intended to be applicable, and was applicable, to the Debtor's plan of reorganization and the Debtor's post confirmation activities is the CORPORATION ACT, in particular, paragraphs 9.05(a) and 9.10 which provide in part as follows:

> § 9.05 Power of corporation to acquire its own shares.
>
> (a) A corporation may acquire its own shares, subject to limitations set forth in Section 9.10 of this Act.
>
> § 9.10. Distributions to shareholders. (a) The board of directors of a corporation may authorize, and the corporation may make, distributions to its shareholders, subject to any restriction in the articles of incorporation and subject also to the limitations of subsection (c) of this Section.

. . . .

> (c) No distribution may be made if, after giving it effect:
>
> (1) the corporation would be insolvent; or
>
> (2) the net assets of the corporation would be less than zero or less than the maximum amount payable at the time of distribution to shareholders having preferential rights in liquidation if the corporation were then to be liquidated.

Ill.Rev.Stat. ch. 32, para. 9.05(a) and 9.10 (Smith–Hurd 1982). Support for the conclusion as to the application of the CORPORATION ACT can be found in Article VIII of the plan of reorganization, which provides that with certain exceptions Illinois law is to govern, and the report filed with the Illinois Secretary of State which indicates any redemption is to be in accordance with the CORPORATION ACT.

However, there is a final point that needs to be recognized which affects the first two. Section 1142(a) of the Bankruptcy Code, which provides as follows, limits non bankruptcy law relating to a debtor's financial condition:

> Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.

11 U.S.C. § 1142(a). Because of § 1142(a) of the Bankruptcy Code, only subparagraph (a) of paragraph 9.10 has an effect. The terms of the plan of reorganization supplant the provisions of subsection (c).

While section 1.10 of the plan mandates a redemption of preferred stock from "pretax profit," sections 1.18 and 1.26 requires that "pretax profit" be determined in accordance with the Internal Revenue Code and the regulations and procedures promulgated thereunder and in accordance with generally accepted accounting principles consistently applied from year to year.

■ Boiled down to the bare essentials, the simple question is whether the 1987 redemption violated either ¶ 9.10 of the

CORPORATION ACT requiring the Board of Directors to authorize the redemption or the terms of the plan of reorganization. This Court finds it violated both.

First, it is absolutely clear, in fact not disputed, that PEARSON's Board of Directors did not authorize the 1987 redemption. To the contrary, the Board of Directors ordered the officers not to make the 1987 redemption. Notwithstanding that order, the officers did so. They did so, and the BANK to protect the 1987 redemption argues rightly so, on the basis that the plan of reorganization mandated a redemption. The BANK's theory is that once the plan of reorganization was approved, the redemption was approved, in fact mandatory, and nothing more had to be done. While it is true the plan of reorganization uses the phrase "mandatorily redeemable", the redemption was not without condition. One of the conditions of the plan of reorganization was that the redemption was to be made from "pretax profit" determined in accordance with the Internal Revenue Code and Regulations and generally accepted accounting principles consistently applied from year to year. Someone had to determine if that condition was met. Under ¶ 9.10(a) that someone was the Board of Directors, not its officers. The BANK's theory is totally inconsistent with the concepts relating to bankruptcy reorganization and PEARSON's plan of reorganization as outlined above.

Second, under the terms of the plan of reorganization the 1987 redemption had to be made from "pretax profit" determined in accordance with the Internal Revenue Code and Regulations and generally accepted accounting principles consistently applied from year to year. It wasn't. In his deposition, STEARNS acknowledges that when he assumed control, the books were a mess and not reconcilable with a physical inventory of the Debtor's assets. He also acknowledged that they went forward without an audit and operated from what records and physical inventory they had. At the trial, SHOOK testified that he prepared the internal financial statements, which were the basis of the redemption, and that they were known to be inaccurate because the inventory was overstated.[5] He also testified that except for GIDWITZ' efforts, no attempts were made to obtain a certified audit, "pretax profits" couldn't be determined unless an accurate inventory was determined, and that a certified audit could not be obtained because of poor accounting procedures preceding the first Chapter 11 filing in 1984. Finally he testified that the internally prepared financial statements did not comply with the requirements of § 1.18 and § 1.26 of the plan.

The testimony of the outside accountants substantiates that those requirements of the plan of reorganization were not met. Peter Cieslak, a partner in the accounting firm of Laventhol & Horwath, hired by GIDWITZ to perform the audit, testified at the trial that because of the inventory problem the accounting firm was engaged to do only a limited balance sheet audit with the income statement and change in position statement not to be audited. The accountant's report, which he signed on behalf of the accounting firm, makes no reference to the Internal Revenue Code and Regulations and as to generally accepted accounting procedures was qualified as it states:

Except as stated in the following paragraph, our examination was made in accordance with generally accepted auditing standards and, accordingly, included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

We did not examine the Company's 1985 consolidated financial statements, and the scope of our engagement for the year ended December 31, 1986, did not provide for the extension of our auditing procedures to the Company's consolidated assets and liabilities as of December 31, 1985. Since the Company's consolidated assets and liabilities as of Decem-

---

5. His testimony went further, to the effect that because of the poor condition of the Debtor's records coming out of the reorganization, the inventory had been overstated from the inception. STEARNS, in his deposition, agrees.

ber 31, 1985, enter materially into the determination of results of operations and changes in financial position for the year ended December 31, 1986, we do not express an opinion on the consolidated statements of income, retained earnings and changes in financial position for the year ended December 31, 1986.

In addition, it was not practicable to extend our auditing procedures to enable us to express an opinion on the consistency of application of accounting principles with the preceding year.

Not only is the accountant's report qualified in that it indicates generally accepted accounting procedures were not fully followed, it excepts any opinion as to the consistency of application of accounting principles from year to year, which also is a requirement of the plan.

The testimony and two written opinions of John Kearney, a partner in the accounting firm of McGladrey & Pullen, hired by the BANK to provide an opinion to refute the trustee's allegations, fail to treat this crucial point. The first and last paragraph of his two written opinions clearly indicate the purpose of his opinions is to determine if under ¶ 9.10 the redemption rendered the Debtor's net assets less than zero or the Debtor insolvent. They also indicate that he did not perform any kind of investigation which could be considered as having been completed in accordance with generally accepted accounting procedures. All he did was to examine certain exhibits and depositions. His two written opinions also specifically avoid any reference to compliance with the Internal Revenue Code and Regulations and generally accepted accounting procedures consistently applied from year to year. Although in one of his opinions he quotes from ¶ 9.10(d) to the effect the Board of Directors may base a determination on either financial statements prepared on the basis of "accounting practices and principles that are reasonable in the circumstances" or a fair valuation on other methods that is reasonable in the

circumstances, later in his opinion, he ignores the former and relies on the latter.[6] Finally, in both opinions he acknowledges there are no reliable financial statements as of the date of the 1987 redemption.

Finally, the BANK, in its briefs admits the following points which are fatal to its claims under Count II:

1. The method of counting and valuing inventory at January 1, 1987, was not in accordance with applicable Internal Revenue Code provisions, and it resulted in a seriously understated inventory reported on the LIFO valuation method. (p. 16)

2. The "write-down" of inventory was not allowable. (p. 17)

3. The Debtor did not maintain adequate records. (p. 23)

For these reasons, the Trustee's challenge of the 1987 redemption under the CORPORATION ACT as not having been authorized by the Board of Directors and for being in violation of the plan of reorganization should be sustained. However, the Trustee's alternate theory under § 544(b) and the Illinois Fraudulent Conveyance Law should be denied. PEARSON's solvency is an issue under the Illinois Fraudulent Conveyance Law. It is not an issue under ¶ 9.10(a) of the CORPORATION ACT or the plan of reorganization. Furthermore, PEARSON's solvency cannot be used by the BANK to protect the 1987 redemption from the Trustee's latter two theories. PEARSON's solvency or lack thereof cannot be the basis of a recovery under both a fraudulent conveyance theory and theories based on ¶ 9.10(a) of the CORPORATION ACT or a violation of the plan of reorganization. The Trustee cannot have it both ways. He cannot come into court brandishing the plan of reorganization on one theory and disregarding it on another. If solvency is an issue, then his theory that the redemption violates the plan of reorganization fails. If solvency is not an issue, then the theory that a fraudu-

---

6. Again it must be kept in mind that ¶ 9.10 in part is not applicable to the Debtor because of the effect of § 1142. Reference to this part of the accountant's opinion is made to show that

generally accepted accounting practices which is the basis for the 1987 redemption under the plan of reorganization were not the basis of his opinion.

lent conveyance occurred, fails. As this Court is finding for the Trustee on two of his theories, there is no reason to rule on the Trustee's remaining theories under Count II.

■ The Trustee also seeks prejudgment interest. Under this Court's previous decision in *Industrial & Municipal Engineering, Inc.,* 127 B.R. 848 (Bkrtcy.C.D.Ill. 1990), the Trustee is entitled to interest on the preferential transfers. In that prior decision, this Court followed the majority rule which favors prejudgment interest in preference actions. This Court has applied that rule in many cases since that decision. *See In re Pearson Industries, Inc.,* 142 B.R. 831 (Bkrtcy.C.D.Ill.1992). An award of interest accrues from the date of the demand, or from the date of the commencement of the adversary proceeding. Because there was no evidence of a demand earlier than the bringing of this action, the Trustee is entitled to prejudgment interest on the sum of $71,741.54 from July 2, 1990, the date this proceeding was filed.

■ However, a different rule must apply to the judgment on the 1987 redemption. The Trustee's recovery is based on state corporate law and ordinary contract law, not under the Bankruptcy Code and state fraudulent conveyance law. His recovery based on a violation of the CORPORATION ACT clearly is under state law. His recovery for a violation of the plan of reorganization also falls under state law as once the plan of reorganization was confirmed it became a matter of state contract law.

■ Where the trustee's claim asserted in the context of an adversary proceeding is based on state law, state law will control the award of prejudgment interest. *In re Investment Bankers, Inc.,* 135 B.R. 659 (Bkrtcy.D.Colo.1991). The Illinois statute provides:

> § 2. Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance[;] on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment.

Ill.Rev.Stat. ch. 17, par. 6402. There is generally no right to recover prejudgment interest unless it is permitted by statute or there is an agreement between the parties. *Moody v. Davenport Bank & Trust Co.,* 239 Ill.App.3d 986, 181 Ill.Dec. 516, 608 N.E.2d 589 (3d Dist.1993); *Alguire v. Walker,* 154 Ill.App.3d 438, 107 Ill.Dec. 279, 506 N.E.2d 1334 (1st Dist.1987). Some courts have held that equity may award such interest but it must be justified by unique factual circumstances. *Richman v. Chicago Bears Football Club, Inc.,* 127 Ill.App.3d 75, 82 Ill.Dec. 225, 468 N.E.2d 487 (1st Dist.1984).

Most Illinois courts hold that a good faith belief or an honest dispute as to the scope of liability will not support an award of prejudgment interest. Discussing the standard the court in *Arthur Pierson & Co., Inc. v. Provimi Veal Corp.,* 887 F.2d 837 (7th Cir.1989), stated:

> Neither an honest dispute regarding the existence of a legal obligation nor the defense of a lawsuit can be regarded as unreasonable and vexatious delays of payment. Rather, the claimant must show that his opponent has thrown obstacles in the way of collection or has otherwise induced the creditor to delay collection proceedings or such claimant must establish conduct on the part of his opponent which is tantamount to fraud.

*Pietka v. Chelco Corp.,* 107 Ill.App.3d 544 [63 Ill.Dec. 223, 234], 437 N.E.2d 872, 883 (1982).

*See also G.M. Sloan Mosaic & Tile Co. v. Newman/Lustig & Assoc.,* 199 Ill.App.3d 518, 145 Ill.Dec. 633, 557 N.E.2d 403 (1st Dist.1990).

The BANK's actions do not reach that standard. All it did was to refuse to pay the money back. While after trial it is difficult to say that the BANK had much in

favor of its position, given the fact that the Debtor was the one to cause the problem by having inadequate books and records and making it to look like there really were profits in order to cause the 1987 redemption in the first place, the BANK's position in seeking a court determination cannot be criticized.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ORDER

For the reasons set forth in the Opinion entered this day;

IT IS, THEREFORE, ORDERED that judgment is entered in favor of the Plaintiff, RICHARD E. BARBER, CHAPTER 7 TRUSTEE FOR PEARSON INDUSTRIES, INC., and against the Defendant, BETTENDORF BANK, on Count I in the amount of $71,741.54, plus interest at the rate of 8.09%, from July 2, 1990, through the date of this Order, plus costs, and on Count II in the amount of $213,206.00 plus costs.