2025 IL App (3d) 240322

Opinion filed March 12, 2025

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| MICHAEL POUNDSTONE, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Plaintiff-Appellee, | ) | La Salle County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-24-0322 |
| | ) | Circuit No. 17-L-35 |
| KEVIN COOK, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Jason Helland, |
| | ) | Judge, presiding. |

JUSTICE ANDERSON delivered the judgment of the court, with opinion.
Presiding Justice Brennan and Justice Holdridge concurred in the judgment and opinion.

**OPINION**

¶ 1        The plaintiff, Michael Poundstone, purchased a house from the defendant, Kevin Cook, in 2016. After discovering undisclosed water damage and rot, Poundstone filed a complaint against Cook, alleging a violation of the Residential Real Property Disclosure Act (Act) (765 ILCS 77/1 *et seq.* (West 2016)) and common-law fraud. Following a bench trial, the circuit court awarded Poundstone damages of $104,000, plus postjudgment interest and attorney fees. Cook appeals, and we affirm.

¶ 2                                I. BACKGROUND

¶ 3 In February 2016, the parties entered into a written contract for Poundstone's purchase of a house located in Ottawa, Illinois, from Cook for $425,000. Cook provided Poundstone with a disclosure report on the condition of the house, as mandated by the Act (765 ILCS 77/20 (West 2016)). In the disclosure, Cook stated, in relevant part, that he had lived in the house for the prior 12 months and was unaware of any "flooding or recurring leakage problems in the crawl space or basement"; "material defects in the basement or foundation"; "leaks or material defects in the roof, ceilings or chimney"; and "material defects in the walls, windows, doors or floors." No home inspection was performed prior to Poundstone taking possession of the property after the sale closed in March 2016.

¶ 4 In March 2017, Poundstone filed a two-count complaint against Cook in La Salle County, alleging a violation of the Act and common-law fraud. The complaint was amended twice, with the second amended complaint including a common-law fraud count seeking "exemplary damages for willful and wanton conduct." The second amended complaint alleged that water had entered into the basement bedrooms and interior of the house after a heavy rain in April 2016, prompting Poundstone to investigate the source of the leaks. His investigation revealed watermarks on drywall and framing in the basement, "[e]xtensive mold in the wall framing behind the basement drywall," watermarks on deck boards under a kitchen window, deck boards that were rotted due to water and structurally unsound, water entering from behind the metal flashing for the stone veneer into the basement and window flashing, rotted studs and plywood by the kitchen window from water damage, and additional framing damaged by water.

¶ 5 Poundstone hired a contractor, who concluded that some of the boards, joists, and ledger boards on the deck had previously been replaced in the vicinity of the more recent damage. In addition, multiple attempts to repair prior water damage were evident, and portions of drywall in

the basement had previously been removed, apparently to look for damage. Poundstone alleged that, based on the scope and extent of the damage, the water leaks around the deck, basement, and kitchen window had been an ongoing problem and Cook "had actual knowledge of the extent of the leaking."

¶ 6 The bench trial began in October 2019, with testimony from contractors and a structural engineer who had examined the house. The parties also testified, with Cook stating that he had been the general contractor when the house was built in 2005 and, in fact, did much of the work himself. He also personally repaired rotted wood underneath the deck in 2011 or 2012 and replaced a section of drywall in the basement after it was damaged when he fell from a treadmill. He maintained, however, that he saw no water damage inside the wall at that time and that he was unaware of any water leakage at the time he sold the house in 2016.

¶ 7 Cook also offered a document he claimed was present at the closing that stated the property was being sold "as-is." Poundstone denied signing the document, and an attorney from the law firm that conducted the closing and the loan officer both testified that the document was not in their files. After the close of Poundstone's case-in-chief, Cook filed a motion for a directed finding, which the trial court denied.

¶ 8 The trial proceeded, and in its April 30, 2020, order, the trial court reviewed the parties' extensive testimony and photographic evidence before finding that,

> "having been placed on notice that water was the source of the damaged condition in which
> he found the wood, [Cook] apparently did not do anything to determine the source of the
> water. Merely, replacing or shoring up rotted wood does nothing to address or correct the
> water source. *** Doing nothing to address the source allowed the water issue to continue
> unabated."

3

The court also found that, in patching the drywall damage allegedly caused by the treadmill accident, Cook

> "would have necessarily have observed the interior of that wall. While the repair was done in 2011 or 2012 and this closing was in 2616, the extent of the water damage and deterioration of the wood and the evident growth of mold should have placed the defendant on notice that there was a water issue on the inside of that wall."

Despite that knowledge, "[h]e did not make any effort to establish the source of the evident water intrusion in to the wall. The Court does not have to accept the defendant's denial of knowledge when the evidence shows to the contrary."

¶ 9    The trial court concluded that "[i]t is unreasonable for defendant to believe the repairs he performed resolved the water issue. He took no steps to ascertain the source and of course, no steps to eliminate the problem. The repairs were merely cosmetic. Therefore, as a matter of fact, it was not reasonable to believe his repairs solved the water issue."

¶ 10    The court also rejected Cook's arguments that Poundstone "was basically guilty of contributory negligence" because he did not have a home inspection or notice obvious defects before closing on the property. First, the court noted that, "in a fraud action, a defendant may not interpose a defense that the plaintiff was negligent in failing to discover the truth," citing *Chapman v. Hosek*, 131 Ill. App. 3d 180, 187-88 (1985). It then explained that the defects could not reasonably have been observed during an ordinary walk-through of the structure because they were either behind the walls or were "12 feet above ground level."

¶ 11    The trial court found that the seller in a real estate sale has

> "a duty to disclose defects which could not be discovered on a reasonable and diligent inspection. *CNA Insurance Company v Dipaulo*, 342 Ill. App. 3d 440 (2003). A seller of a

4

used home has a duty to disclose facts which one, materially affect the value or desirability of the property, two, are known or are accessible only to the seller, and three, the seller knows are not accessible or known to a diligent buyer. *Fox v Heimann*, 375 Ill. App. 3d 35 (2007)."

The court held Cook violated that duty to disclose because, "as a matter of fact based on the testimony in the record, *** the defendant had access to the information concerning the defects and knew the information was not reasonably accessible to plaintiff" when he signed the real estate disclosure report.

¶ 12    The trial court rejected Cook's claim that the property had been sold "as-is" based on a purported closing document because Poundstone denied signing it and, in any event, the parties later entered into the final real estate contract. That contract included a provision that, if agreed to, would have made the sale "as-is," but that provision was not executed by the parties. The court also believed that the purported "as-is" agreement proffered by Cook was superseded by the parties' final sales contract under the doctrine of merger.

¶ 13    Turning to the issue of damages, the trial court found that, although it was "troubled by the lack of concrete evidence of the amount of money paid by the plaintiff to Arambula [(Poundstone's general contractor)] to repair the property," it was "convinced based on the overwhelming evidence and the photographs, the uncontradicted evidence of the engineer ***, the uncontradicted evidence of Arambula that the property contained serious defects." In the absence of any receipts or cancelled checks, the court noted that "absolute certainty as to the amount of damage is not required to justify a recovery. It is only necessary that evidence tend to establish a basis for assessment of damages with a fair degree of probability. [Citations.]" The court then concluded that Poundstone had sufficiently established damages of $104,000 based on his showing of the

scope and duration of the repair work required, including Arambula's testimony that the repairs began in June 2016 and were not finished until August 2017. It denied Poundstone's claim for exemplary damages based on common-law fraud, however, because he failed to establish those elements by clear and convincing evidence. Finally, the trial court's order reserved the issue of attorney fees for a later hearing.

¶ 14    At that point, Cook filed a notice of appeal from the order. On its own motion, this court dismissed the appeal for lack of jurisdiction in case No. 3-20-0200. We concluded that the April 30, 2020, order was not final and appealable in the absence of the mandatory finding in Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), when Poundstone's request for attorney fees was still pending before the trial court.

¶ 15    On remand from this court, Cook filed a motion to dismiss the case with prejudice as well as a motion to reconsider the April 30 judgment. The trial court denied both motions and ordered Poundstone to file an amended fee motion by January 4, 2024, which he did. After a hearing, the trial court awarded Poundstone fees of $34,559.18 on April 10, 2024. Cook filed a timely notice of appeal.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, Cook raises several issues. He asserts that (1) the denial of his motion for a directed finding was in error, (2) the trial court applied the wrong standard in entering judgment on the merits for Poundstone, (3) the damage award was not established to a reasonable degree of certainty, and (4) the trial court erred in denying his motion to reconsider and, instead, entering a final judgment against him on April 10, 2024.

¶ 18                          A. Motion for a Directed Finding

6

¶ 19    We begin by considering whether the trial court erred in denying Cook's motion for a directed finding. We will not overturn a ruling on a motion for a directed finding unless it is against the manifest weight of the evidence. *In re Estate of Coffman*, 2023 IL 128867, ¶ 54. A decision is deemed to be against the manifest weight of the evidence only if the opposite conclusion is apparent or the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Steed v. Rezin Orthopedics & Sports Medicine, S.C.*, 2021 IL 125150, ¶ 44.

¶ 20    In his motion, Cook argued that Poundstone failed to establish the required elements of his claims under both the Act and common-law fraud. To make a *prima facie* showing of a violation under the Act, Poundstone had to offer some evidence showing that Cook knew the real estate disclosure report was inaccurate or that he had no reasonable belief "that a material defect or other matter not disclosed had been corrected." 765 ILCS 77/25(a) (West 2016).

¶ 21    Cook asserts that, because he made some repairs a few years earlier, he "had no reason to believe that there was any additional problems, certainly not behind the walls, where no one can see until walls are ripped apart." The trial court, however, found that the evidence supported a finding that the water damage existed long before the sale in 2016 and, because Cook was the sole owner of the house from the time it was constructed until then, there was "sufficient proof to establish a *prima facie* case that would create an issue of fact as to whether or not the defendant knew or should have known; and, if he knew or should have known, whether or not what he knew or should have known should have been communicated to the plaintiff."

¶ 22    As for the common-law fraud claims, Cook argues that Poundstone failed to make the requisite showing of reliance by offering only a single text message from Cook stating that Poundstone would be happy with the house. The trial court, however, found that Poundstone's testimony provided additional evidence of his reliance. In denying Cook's motions for a directed

finding, the court stated, "there were other communications that existed between the plaintiff and the defendant pertaining to the condition of the house and that [Poundstone] relied upon those representations that were made and his reliance was reasonable, he had no reason to suspect that anything was amiss," which "at this stage is sufficient to establish a *prima facie* case on the common law aspects as well."

¶ 23    After reviewing the evidence and testimony adduced prior to Cook's motion for a directed finding, we agree with the trial court that Poundstone presented sufficient evidence to make a *prima facie* showing of common-law fraud and an Act violation. The evidence showed that Cook had previously repaired some of the rotted and water-damaged areas of the house, supporting a reasonable inference that he knew of the ongoing problems and, although he had taken steps to repair the damage, he had not attempted to correct the underlying causes of those problems. Because the opposite conclusion is not readily apparent and the trial court's findings were not unreasonable, arbitrary, or lacking in evidentiary support, we affirm the denial of Cook's motion for a directed finding. See *Steed*, 2021 IL 125150, ¶ 44.

¶ 24                    B. Application of the Correct Legal Standard at Trial

¶ 25    Cook next contends that, while the trial court seemingly *acknowledged* the correct standard of proof, it *applied* the wrong standard in awarding judgment for Poundstone. He asserts that relief under both the Act and common-law fraud requires clear and convincing evidence but that the trial court applied a lower standard that was closer to a preponderance of the evidence. Because the issue of whether the trial court applied the proper legal standard presents a question of law, we review it *de novo*. *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 26. After examining the judgment order and the trial record, we conclude that they do not support Cook's contention that the court applied the wrong evidentiary standard.

8

¶ 26        Nonetheless, that determination does not end our inquiry. Cook asserts that the trial court failed to properly apply the clear-and-convincing-evidence standard, and, instead, applied a lower standard of legal proof. Our supreme court has defined "clear and convincing evidence" as "more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense." *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995). To determine whether the evidence here met that standard, we will examine the record below.

¶ 27        Poundstone's second amended complaint alleged that Cook provided inaccurate answers to questions one, two, four, and six of the mandatory real estate disclosure. In question one, Cook responded "yes" when asked if "Seller has occupied the property within the last 12 months." At trial, however, Cook admitted that he had not lived at the house during that time period. Question two inquired into whether Cook was "aware of flooding or recurrent leakage problems in the crawlspace or basement," to which Cook answered "no." He asserts that he was aware of only one episode of flooding in the basement, which occurred during the original construction of the house in 2005. At that time, a contractor punctured a radiant heating pipe, causing the floor to warp. The problem was timely corrected and never recurred. Cook also answered "no" to question four, asking if he was "aware of material defects in the basement or foundation (including cracks and bulges)." He maintains that no cracks or bulges were identified during several walk-throughs of the property. He adds that he had no reason to believe mold was present behind the basement wall at the time he repaired the hole from the treadmill accident in 2011 or 2012. To repair the damage, he had to cut a larger hole in the drywall but denied seeing any mold. Finally, when asked if he was "aware of material defects in the walls, windows, doors or floors" of the house in question six, Cook again answered "no." Cook asserts that, because he properly repaired the accidental hole in the basement drywall and saw "no evidence of mold," he "reasonably believed that the condition

9

had been corrected" and "was unaware that there was of any other condition within the house causing damage."

¶ 28    Further, Cook admitted at trial that his response to question one falsely claimed that he had lived at the house in the prior 12 months, showing that, at least in that respect, the disclosure report was incorrect. As for Cook's other alleged misstatements in the disclosure, although he testified to reinforcing areas of the deck after removing and replacing rotten deck joists, he did not testify to ever investigating and addressing the cause of that prior water damage. The trial court recognized the importance of that distinction, noting that, "having been placed on notice that water was the source of the damaged condition in which he found the wood, [Cook] apparently did not do anything to determine the source of the water." Thus, by failing to look into the source of the damage, Cook created a scenario in which water could continue to damage the structure of the house. The trial court also noted that the hole Cook repaired in the interior basement wall was located in the same place that Poundstone later found extensive water damage, suggesting that some water damage was also present when Cook made the repair.

¶ 29    Overall, the extent of the water damage found in multiple areas of the house, which Cook largely built and repaired himself, supports the trial court's determination that he was aware of "recurrent leakage problems in the crawlspace or basement"; "material defects in the basement or foundation (including cracks and bulges)"; and "material defects in the walls, windows, doors or floors." Although Cook claims that he was only aware of a single incident of flooding in the basement that occurred while the house was under construction, question two also asked about "recurrent leakage problems." The water damage appeared to have been the result of ongoing leaks rather than flooding. Similarly, Cook focuses on the absence of any identified cracks or bulges in

10

the basement or foundation in addressing his response to question four, but those conditions are merely two types of potential material defects asked about in that question.

¶ 30     Cook also maintains that the location of the defects inside the walls precluded him from knowing about material defects in the house's foundation, basement, walls, windows, doors or floors that formed the subjects of questions four and six. The record, however, shows that Cook was unusually familiar with the structure and problems of his house because he had acted as the general contractor and had been extremely hands-on during its construction, working alongside hired workers. Moreover, he testified to personally performing a number of repairs in areas that were later found to be water damaged without attempting to correct the cause of the ongoing damage. His personal involvement in the construction and repair of the house uniquely sets his knowledge of the structure apart from that of the typical homeowner. In light of the extensive water damage in many areas of the home that continued over numerous years, the trial court had ample basis to find (under the clear and convincing standard) that Cook violated the Act.

¶ 31                                    C. Propriety of the Damage Award

¶ 32     Cook next argues that Poundstone failed to establish his damages to a reasonable degree of certainty because he did not offer written documentation, such as cancelled checks or receipts, of all the payments he allegedly made to his contractor. See *Carey v. American Family Brokerage, Inc.*, 391 Ill. App. 3d 273, 277-78 (2009) (stating the standard for proof of damages). Cook adds that the lack of written evidence violates the best evidence rule, which requires the production of the original writing, absent a showing that it is not available. *Kwai Paul Lam v. Northern Illinois Gas Co.*, 114 Ill. App. 3d 325, 330 (1983). On appeal, a damage award is reviewed to determine whether it is against the manifest weight of the evidence, meaning that "an opposite conclusion is

11

apparent or *** the findings appear to be unreasonable, arbitrary, or not based on the evidence." *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13.

¶ 33        Initially, we reject Cook's claim that the award must be overturned because the best evidence rule was violated. The best evidence rule is merely

> "a preference for the production of the original of a writing when the contents of the writing are sought to be proved. There is no general rule that a party must produce the best evidence that the nature of the case permits. (E. Cleary & M. Graham, Handbook of Illinois Evidence § 1001.1, at 652 (4th ed. 1984).) The best evidence rule does not apply where a party seeks to prove a fact which has an existence independent of any writing, even though the fact might have been reduced to, or is evidenced by, a writing." *Jones v. Consolidation Coal Co.*, 174 Ill. App. 3d 38, 42 (1988).

Because Poundstone was seeking to prove payments that existed apart from a receipt or cancelled check, the best evidence rule was simply not applicable here.

¶ 34        Instead of providing written evidence, Poundstone provided testimony about the cash payments he made to Arambula, his contractor, for the extensive repairs. While the admission of receipts or cancelled checks would certainly have provided corroboration for that testimony, the best evidence rule does not disqualify the use of witness testimony to independently establish the sums paid. The trial court was entitled to consider all evidence on damages, whether testimonial or documentary, before entering a damage award.

¶ 35        Here, the trial court was acutely aware of the lack of written payment evidence before it entered the damage award. As Cook notes, the court stated,

> "The plaintiff did not produce cancelled checks, cashier's checks, withdrawal slips, loan documents, paid receipts from the contractor, or paid receipts for materials. (Plaintiff's

12

Exhibit 19 was not admitted in evidence.) The Court is aware that the contractor was not licensed and did not obtain construction permits. The Court is aware that the contractor was not provided a 1099 by the plaintiff."

¶ 36    As the court recognized, damages need not be proven with absolute certainty. Our supreme court has explained that " 'basic contract theory requires that damages be proved with reasonable certainty and precludes damages based on conjecture or speculation.' " *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 106-07 (2006) (quoting *Ouwenga v. Nu-Way Ag, Inc.*, 239 Ill. App. 3d 518, 523 (1992)). Acting as the trier of fact, the trial court in this case deemed the payment testimony was sufficiently credible and persuasive to support the damages awarded.

¶ 37    As a reviewing court, "we will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses." *People v. Conway*, 2023 IL 127670, ¶ 16; see *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 452-53 (2009) (applying the same standard in a civil case). Nothing in the record supports the conclusion that the trial court's decision to credit the testimony on damages elicited by Poundstone was in error. The testimony and photographic evidence support the finding that the damage to the house was both widespread and serious, requiring extensive repairs that took approximately a year to perform. Viewed in that context, we cannot say that the measure of damages was not sufficiently established.

¶ 38                                    D. Motion to Reconsider

¶ 39    Finally, Cook maintains that the denial of his motion to reconsider and the subsequent entry of the court's final order constituted error as a matter of law. A motion to reconsider may serve multiple purposes. It may be intended to make the trial court aware of (1) new evidence, (2) changes in the applicable law, or (3) errors in the application of existing precedent. *Liceaga v.*

13

*Baez*, 2019 IL App (1st) 181170, ¶ 25. Here, Cook asserts that the trial court misapplied existing law, making the question one of law that we will review *de novo*. *In re Marriage of Prusak*, 2020 IL App (3d) 190688, ¶ 30.

¶ 40    Cook initially claims that the trial court erred by "essentially read[ing] in to the record the transcript of the prior partial ruling *** as opposed to a complete analysis of the foregoing which was fully set forth in the record due to its inclusion after the return to the Trial Court." We fail to see how this claim establishes either the relevance of new law or a misapplication of existing law. Because Cook fails to explain how the trial court's decision not to fully reanalyze its prior decision constitutes a misapplication of the law, we find his argument unpersuasive.

¶ 41                                E. Postjudgment Interest

¶ 42    Cook also asserts that the trial court misapplied the law in setting the start date for postjudgment interest. More specifically, Cook contends that the circuit court erroneously awarded postjudgment interest that began on April 30, 2020 (the original judgment date, which did not address fees), rather than April 10, 2024 (the date that a full and final judgment, including attorney fees, was entered).

¶ 43    Section 2-1303(a) of the Code of Civil Procedure states, in relevant part, that

"judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied ***. When judgment is entered upon any award ***, interest shall be computed at the above rate, from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment." 735 ILCS 5/2-1303(a) (West 2022).

¶ 44    Cook supports his argument by citing the First District's decision in *Eddings v. Board of Education of Chicago*, 305 Ill. App. 3d 584, 594 (1999), where the court determined postjudgment

14

interest ought to commence on the date of *full and final* judgment. The *Eddings* court, however, engaged in no analysis or discussion relative to that finding.

¶ 45 *Eddings* is arguably inconsistent with other cases cited by Poundstone. Specifically, in *Certain Underwriters at Lloyd's, London v. Abbott Laboratories*, 2014 IL App (1st) 132020, ¶¶ 63-64, the First District more recently upheld an award of postjudgment interest beginning at the time the judgment order was entered, despite the trial court's later entry of its *final* judgment. In making that ruling, the appellate court relied on the reasoning in *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668 (2004), after finding the facts in that case to be virtually indistinguishable. *Certain Underwriters*, 2014 IL App (1st) 132020, ¶¶ 63-64.

¶ 46 In *Andrews*, an award of attorney fees and prejudgment interest was entered about five months prior to the entry of the final judgment order, which incorporated the court's earlier findings. Because the *Andrews* court concluded that the original written order was "an 'award, report, or verdict' within the meaning of [section 2-1303 of] the Code," the award of postjudgment interest properly began from the date of the original order. *Andrews*, 351 Ill. App. 3d at 683; see *Certain Underwriters*, 2014 IL App (1st) 132020, ¶ 63.

¶ 47 Poundstone argues that *Eddings* should be disregarded because it is an older case that was "overruled" by *Certain Underwriters*. We do not agree. An appellate panel, division, or district of the appellate court has no authority to overrule another panel, division, or district. Only a higher court can overrule the appellate court. See *In re Marriage of Gutman*, 232 Ill. 2d 145, 149-50 (2008). That is not to say, however, that appellate panels cannot disagree. See *In re Parentage of D.S.*, 2021 IL App (1st) 192257, ¶ 39 n.4 (stating that the appellate "court is not bound by even published rulings from other districts, divisions, or panels"). When that happens, the circuit court is bound by the decision of the appellate court of the district in which it sits. *State Farm Fire &*

15

*Casualty Co. v. Yapejian*, 152 Ill. 2d 533, 539-40 (1992). If conflicting decisions exist within that district, the circuit court should follow the better-reasoned and more applicable case, not necessarily the most recent one.

¶ 48    But here, we need not determine which line of cases is better reasoned because each rested on its own facts. As another First District decision, *Inman v. Howe Freightways, Inc.*, 2022 IL App (1st) 210274, ¶¶ 77-78, observed, the general rule is that the date on which postjudgment interest begins to accrue depends on the specific circumstances of each case. As the *Inman* court explained:

> " 'An award of interest on a money judgment requires that the amount of money to be paid was certain and the judgment debtor enjoyed the improper use of the money during the period for which interest is to be awarded.' *Browning, Ektelon Division v. Williams*, 348 Ill. App. 3d 830, 833 (2004). If the damages are certain, then interest begins to accrue at the time the court enters the original judgment. See *Kramer v. Mount Carmel Shelter Care Facility, Inc.*, 322 Ill. App. 3d 389, 393 (2001) (interest accrued at time of original judgment where damages remained definite and certain). However, if the damages are uncertain at the time of the original judgment, then interest begins to accrue at the time the court enters a subsequent judgment. See *Poe v. Industrial Comm'n*, 230 Ill. App. 3d 1, 8-9 (1992) (interest accrued at time of new judgment where no definite amount of damages had been set previously). The date from which interest begins to accrue depends on the unique circumstances of each case (*Kramer*, 322 Ill. App. 3d at 392) and is a question of law that we review *de novo*. *Decker v. St. Mary's Hospital*, 266 Ill. App. 3d 523, 525 (1994), *overruled on other grounds by Star Charters v. Figueroa*, 192 Ill. 2d 47 (2000)." *Inman*, 2022 IL App (1st) 210274, ¶ 77.

¶ 49 Here, the trial court's decision that interest ought to accrue beginning on April 30, 2020, was proper because the measure of compensatory damages was sufficiently certain at that time. The trial court had determined the proper damages award, and all that remained was a determination of attorney fees.

¶ 50 In *Robinson v. Robinson*, 140 Ill. App. 3d 610, 611-12 (1986), the court held that postjudgment interest accrues on attorney fee awards. We see nothing in the language of section 2-1303(a) that indicates otherwise. In relevant part, section 2-1303 states,

> "judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied ***. When judgment is entered upon *any award ****, interest shall be computed [at the rate of 9% per annum], from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment." (Emphasis added.) 735 ILCS 5/2-1303(a) (West 2022).

The statute does not require the entry of a "final and appealable" judgment before postjudgment interest may be awarded. Accordingly, the trial court did not err in awarding postjudgment interest to accrue from the date of its April 30, 2020, order. However, it appears to us that there should be a separate bucket of postjudgment interest for the April 10, 2024, fee award. Given that postjudgment interest arises automatically by statute, we need not modify the April 10, 2024, order.

¶ 51                                      III. CONCLUSION

¶ 52 For the reasons stated, the judgment of the circuit court of La Salle County is affirmed.

¶ 53 Affirmed.

17

*Poundstone v. Cook*, 2025 IL App (3d) 240322

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of La Salle County, No. 17-L-35; the Hon. Jason Helland, Judge, presiding. |
| **Attorneys for Appellant:** | Michael W. Fuller, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Matthew J. Mueller, of Mueller, Lawson & Frobish, P.C., of Morris, for appellee. |